# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION<br><br>This Document Relates To:<br>In re MFS<br>      04-md-15863-04 | MDL 1586<br>Case No. 04-MD-15863<br>(Judge J. Frederick Motz) |
| BRUCE RIGGS, et al.,  Individually and<br>On Behalf of All Others Similarly Situated,<br><br>                  Plaintiff,<br>    v.<br><br>MASSACHUSETTS FINANCIAL<br>SERVICES COMPANY, et al.<br><br>                Defendants. | Case No. 04-cv-01162-JFM |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

Page

I. NATURE OF THE ACTION ................................................................. 1

II. JURISDICTION AND VENUE ............................................................ 5

III. PARTIES ........................................................................................... 6

    A. Lead Plaintiff ............................................................................ 6

    B. Defendants And Significant Non-Parties ................................... 6

        1. Non-Party MFS Fund "Complex" ................................... 6

        2. The Parent Defendant ...................................................... 8

        3. The Investment Advisor/Fund Sponsor ............................ 9

        4. The Administrator ............................................................ 10

        5. Registrants/Issuer Defendants ........................................ 11

        6. The Distributor Defendant ............................................... 13

        7. Shareholder Servicing Agent ........................................... 13

        8. The MFS Individual Defendants ...................................... 13

        9. The Timer Defendants ..................................................... 15

            a. Canary ................................................................... 15

            b. Security Brokerage, Inc. ........................................ 16

            c. Wilshire Associates ............................................... 17

            d. Trout ..................................................................... 17

        10. The Facilitator Broker Defendants ................................. 17

        11. The Clearing Broker Defendants ..................................... 19

        12. Financier Defendants ....................................................... 27

    C. The John Doe Defendants ........................................................ 28

i

IV.  FACTUAL ALLEGATIONS ............................................................28

     A.  Overview Of Market Timing/Late Trading Practices...........................28

         1.  Background Information And The Forward-Pricing
             Rule ................................................................28

         2.  Subverting The Forward-Pricing Rule Through
             Market Timing And Late Trading ...................................30

     B.  Material Misstatements And Omissions In The MFS
         Prospectuses Concerning Market Timing.................................31

     C.  The Defendants' Knowledge And Direct Participation In
         The Wrongful Conduct ...................................................33

         1.  Market Timing at MFS ...............................................34

             a.  Overview.......................................................34

             b.  Specific Examples Of Timing At MFS .......................36

                 (1)  Canary..................................................36

                 (2)  Security Brokerage, Inc. ................................37

                 (3)  Wilshire Associates ....................................39

         2.  Facilitator Broker Defendants' Participation In The
             Wrongful Conduct ..................................................40

             a.  Overview.......................................................40

             b.  Examples Of The Wrongful Conduct .........................41

                 i.    Brean Murray...........................................41

                 ii.   CIBC ..................................................42

                 iii.  Salomon Smith Barney.................................44

                 iv.   Morgan Stanley........................................44

         3.  The Clearing Broker Defendants' Participation In
             The Wrongful Conduct ..............................................45

             a.  Overview.......................................................45

             b.  Examples Of The Wrongful Conduct .........................46

i.        Bear Stearns ......................................................................46

ii.       Bank of America ...............................................................50

iii.      Prudential...........................................................................51

iv.       Charles Schwab .................................................................55

v.        Security Trust Company ....................................................56

vi.       J.B. Oxford........................................................................58

4.        The Financier Defendants' Participation In The
          Wrongful Conduct .....................................................................60

D.        Harm To MFS Funds Investors ......................................................61

E.        The Failure Of The Trustee Defendants ........................................64

F.        Defendants' Profits From The Unlawful Conduct...........................67

1.        12b-1 Fees..................................................................................67

2.        Advisory and Management Fees ...............................................69

3.        Directed Brokerage And Shelf Space Payments To
          Broker Dealers ..........................................................................70

V.     CLASS ALLEGATIONS ........................................................................74

VI.    CAUSES OF ACTION............................................................................76

COUNT I
        Against Defendants Massachusetts Investor Trust, Massachusetts
        Investor  Growth Stock Fund, MFS Government Securities Fund,
        MFS Series Trust I,  MFS Series Trust II, MFS Series Trust IV,
        MFS Series Trust V, MFS  Series Trust IX, MFS Series Trust X,
        MFD, Ballen, And Parke  For Violations Of § 11 Of The Securities
        Act.............................................................................................................76

COUNT II
        Against Defendants Massachusetts Investor Trust,  Massachusetts
        Investor Growth Stock Fund, MFS Government Securities  Fund,
        MFS Series Trust I, MFS Series Trust II, MFS Series Trust IV,
        MFS Series Trust V, MFS Series Trust IX, MFS Series Trust X,
        And MFD For Violations Of § 12(a)(2) Of The Securities Act .......................78

COUNT III
    Against The Sun Life Defendants And Defendants MFS, Ballen,
    And Parke  For Violations Of § 15 Of The Securities Act.................................................80

COUNT IV
    Against All Defendants For Violations Of § 10(b) Of The
    Exchange  Act And Rule 10b-5 Promulgated Thereunder ................................................81

COUNT V
    Against All Defendants For Violations Of § 10(b) Of The
    Exchange Act And Rule 10b-5 Promulgated Thereunder .................................................84

COUNT VI
    Against The Sun Life Defendants and Defendants MFS, Ballen,
    And Parke For Violations Of § 20(a) Of The Exchange Act ...........................................86

COUNT VII
    Against Defendants Massachusetts Investor Trust,  Massachusetts
    Investor Growth Stock Fund, MFS  Government Securities Fund,
    MFS Series Trust I, MFS Series Trust II, MFS Series Trust IV,
    MFS Series Trust V,  MFS Series Trust IX, MFS Series Trust X,
    MFS, Ballen, And Parke For Violations Of § 34(b) Of The
    Investment Company Act ..................................................................................................87

COUNT VIII
    Against Defendants MFS, MFD, Ballen, And Parke For Violations
    Of § 36(a) Of The Investment Company Act ...................................................................88

COUNT IX
    Against Defendants Massachusetts Investor Trust,  Massachusetts
    Investor Growth Stock Fund,  MFS Government Securities Fund,
    MFS Series  Trust I, MFS Series Trust II, MFS Series Trust IV,
    MFS Series Trust V, MFS Series Trust IX,  MFS Series Trust X,
    MFS, MFD, And MFSSC For Violations Of § 36(b) Of The
    Investment Company Act ..................................................................................................89

COUNT X
    Against The Sun Life Defendants And Defendants MFS, Ballen,
    And Parke For  Violations Of § 48(a) Of The Investment Company
    Act................................................................................................................................90

COUNT XI
 Against Defendants The Sun Life Defendants And  Defendants
 Massachusetts Investor Trust, Massachusetts  Investor Growth
 Stock Fund, MFS Government Securities  Fund, MFS Series Trust
 I, MFS Series Trust II, MFS Series  Trust IV, MFS Series Trust V,
 MFS Series Trust IX, MFS  Series Trust X, MFS, MFD, and
 MFSSC, Ballen, And Parke For Breach Of Fiduciary
 Duty/Constructive Fraud ..................................................................................91

COUNT XII
 Against All Defendants For Aiding And  Abetting Breach Of
 Fiduciary Duty..................................................................................................92

COUNT XIII
 Against All Defendants For Unjust Enrichment...............................................93

VII. PRAYER FOR RELIEF ....................................................................................94

VIII. JURY TRIAL DEMANDED..............................................................................94

Lead Plaintiff, the City of Chicago Deferred Compensation Plan ("Chicago"), alleges the following based upon the investigation of Lead Counsel, which included, among other things, a review of internal Massachusetts Financial Services Company ("MFS") documents, United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings and reports and advisories regarding MFS Funds, press releases, media reports, the complaint filed by the SEC and extensive interviews with a confidential witness with direct knowledge of the market timing and late trading activities in MFS Funds and throughout the mutual fund industry ("Timing Witness #1).

I.    NATURE OF THE ACTION

1.    Lead Plaintiff, Chicago, brings this action on behalf of all persons that purchased and/or held shares of MFS mutual funds advised by MFS during the period from December 15, 1998 to December 8, 2003, inclusive (the "Class Period"), and were harmed by a pattern of trading practices known as "market timing" and/or "late trading."   The wrongful acts and misconduct alleged herein, much of which has been admitted by defendants, are the subject of administrative actions and investigations by various regulatory agencies, including the SEC, the New York State Attorney General and the Massachusetts Secretary of the Commonwealth.

2.    The MFS fund family consists of over 100 mutual funds into which retail investors could contribute cash for the purpose of creating a pool of assets with which to invest (the "MFS Funds").   These mutual funds hold no assets apart from investors' deposits, nor do they conduct any investment or operating activities on their own.   Instead, the funds' operations are controlled by MFS, a separate legal entity which, directly and through its subsidiaries and affiliates, performs all activities necessary to carry out the funds' investment objectives.   For performing these services, MFS and its affiliates are paid fees from the funds' deposits in an

amount equal to a percentage of the assets under management.  Accordingly, the larger the assets under management, the greater the fees MFS receives.

3.      Market timing is a practice whereby certain investors take advantage of inefficiencies in the pricing of mutual fund shares by rapidly trading in and out of these funds on multiple occasions within a short period of time.  By executing a significant number of these trades quickly, market timers profit by capitalizing on the differential between the price of the mutual fund itself, and the value of the underlying securities that comprise the mutual fund.  Late trading is a variation of market timing, in which certain investors are permitted to trade mutual fund shares at the prior day's prices, in violation of federal law.

4.      Throughout the Class Period, MFS knew or, but for its recklessness, should have known that market timing and late trading caused significant monetary harm to other fund investors.  By quickly trading in and out of mutual funds, market timers dilute the investment gains that would otherwise be realized by long-term investors, without sharing any of the losses incurred.  Market timers also impose additional transaction costs upon innocent fund investors, due to the huge inflows and outflows of cash resulting from their rapid "in and out" trading.  To pay out these market timers on short notice, portfolio managers must invest disproportionate amounts of their funds' assets in cash and other highly liquid assets, paying a significantly lower rate of return than other assets consistent with the fund's investment guidelines.  These huge inflows and outflows also required portfolio managers to adopt highly sophisticated and expensive hedging techniques to protect the fund's assets against timing activity, thereby increasing expenses borne by innocent investors in the funds.

5.      Due to the harm to investors caused by market timing, MFS purported to maintain policies that prohibited market timing activity by limiting trading in and out of the mutual funds

it advised.  The details of these polices were provided in registration statements and prospectuses filed with the SEC throughout the Class Period.

6.     MFS has now admitted, however, that contrary to the representations in the various prospectuses, it permitted market timing to occur during the Class Period, and that innocent investors were harmed as a result of this activity.  Indeed, MFS encouraged and facilitated this conduct, despite its knowledge of the harm that market timing caused to long-term investors, primarily to increase the size of the asset portfolios under management and, in turn, MFS's fees for managing these portfolios.  As a result of its unlawful conduct, MFS consented to the SEC's entry of an order on February 5, 2004 finding that it had violated anti-fraud provisions of the federal securities laws.  MFS also has settled investigations conducted by the New York and New Hampshire Attorneys General.  Pursuant to these settlements, MFS has agreed to pay $175 million in disgorgement, $50 million in civil penalties, and a $1 million administrative fine, for a total of $226 million.  Furthermore, MFS agreed to cut its management fees by a total of $125 million over the next five years.

7.     MFS did not act alone, however, in the perpetration of this scheme which cost innocent investors hundreds of millions of dollars in investment losses and improper fees.  For example, in addition to selling the right to engage in market timing (generally known as "timing capacity") directly to certain select investors, MFS also engaged various large brokerage firms, including defendants Bank of America, Bear Stearns, Charles Schwab, Prudential, Salomon Smith Barney and Canadian Imperial Bank of Commerce, to sell timing capacity on its behalf. As detailed below, these brokerage firms negotiated for timing capacity in various funds controlled by MFS, and then sold this capacity to the market timers themselves.  These brokers received substantial fees from both the timers to whom they sold the capacity, and from the

funds controlled by MFS, calculated as a percentage of the amounts traded by the market timers. These same brokers increased their fees further by steering their own clients into these funds in return for additional fees from MFS, without disclosing to their clients that the funds permitted market timing, or the harm to long-term investors that resulted from this activity.

8.      The wrongful conduct of the brokers was not limited to negotiating for and selling timing capacity in the funds.  Certain of these brokers also executed, or "cleared," timing transactions with full knowledge of the harmful effects of timing on the performance of mutual funds, in return for fees paid by both the funds managed by MFS, as well as the market timers themselves.  These same brokers implemented a variety of deceptive devices and schemes for the purpose of facilitating market timing.  Other large brokerage firms provided sophisticated financing arrangements to market timers that included the creation of false accounts to facilitate the timing scheme, all in return for substantial fees and other compensation.

9.      Although each fund within the MFS Fund Complex was nominally governed by its own Board of Trustees ("Board") throughout the Class Period, these trustees were selected and nominated, in most cases, not by the shareholders of the funds themselves, but by MFS. These individuals served on multiple fund boards advised by MFS, and owed their positions, along with the substantial compensation they received as a result, to MFS.  As a result, these trustees suffered from inherent conflicts of interest that precluded them from discharging their fiduciary duties of care, loyalty and good faith, which should have included prohibiting market timing, enforcing the terms of the various prospectuses, and otherwise acting to safeguard the best interests of innocent investors in the funds.

## II.    JURISDICTION AND VENUE

10.    This Court and the United States District Court of the District of Massachusetts (the "Transferor Court") have jurisdiction over the subject matter of this action pursuant to: § 22 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77v); § 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78aa); § 44 of the Investment Company Act of 1940 (the "ICA") (15 U.S.C. §§ 80a-43); and, 28 U.S.C. §§ 1331, 1337.  This Court and the Transferor Court also have supplemental jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1367.

11.    The claims alleged herein arise under: §§ 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77o); §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §§ 240.10b-5); §§ 34(b), 36(a), 36(b) and 48(a) of the ICA (15 U.S.C. §§ 80a-33(b), 80a-35(a)-(b), 80a-47(a)); and state and common law.  In connection with the acts, conduct and other wrongs complained of herein, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities exchange.

12.    Venue is proper in the District of Maryland and the District of Massachusetts ("Transferor District") pursuant to § 22 of the Securities Act (15 U.S.C. §77v), § 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1391(b) and 1391(c).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in the District of Maryland and the Transferor District.  Defendants conducted other substantial business within the District of Maryland the Transferor District and many Class members reside within the District of Maryland and the Transferor District.  Venue is also proper in the District of Maryland pursuant to the multi-district litigation provisions under 28 U.S.C. § 1407.

III.     PARTIES

    A.     Lead Plaintiff

13.     Lead Plaintiff, Chicago, is a municipal deferred compensation plan located in Chicago, Illinois. Chicago was formed pursuant to Section 457 of the United States Internal Revenue Code (26 U.S.C. § 457) for the benefit of the current and retired employees of the City of Chicago and their beneficiaries. During the Class Period, Chicago purchased and held shares of certain of the MFS Funds. As a result of the conduct alleged herein, Chicago suffered damages both in connection with its purchases of shares of MFS Funds and by virtue of holding shares of the MFS Funds during the Class Period.

    B.     Defendants And Significant Non-Parties

        1.     Non-Party MFS Fund "Complex"

14.     The MFS Fund Complex, as discussed herein, consists of all of the MFS Funds and the various entities that administer and control those funds. Included in the MFS Fund Complex are MFS (the fund sponsor and investment advisor), its parent and affiliates, the registrants (or issuers) of the fund shares, the underwriters of the fund shares, the trustees of the funds, and the funds themselves. The chart below illustrates the structure of the MFS Fund Complex:



15.    (a)    Non-Party MFS Funds are open-end mutual funds in which investors contribute cash for the purpose of creating a pool of assets with which to invest and purchase securities.  In return for their deposits, investors receive shares in the MFS Fund in an amount directly proportionate to the amount of their investment (*i.e.*, the larger the amount invested, the more shares the investor receives in the fund).  This cash is then used to purchase stocks or other securities, consistent with the investment goals and objectives of the fund.  The MFS Funds' shares are issued to fund investors pursuant to registration statements and prospectuses that must comply with the Securities Act and the ICA.

(b)    The MFS Funds hold no assets apart from the deposits of their investors, nor do they conduct any operating or investment activities on their own.  Instead, the MFS Funds are part of a labyrinthine related structure, commonly known as a "complex," in which separate

7

legal entities, which are nonetheless related to MFS, perform and control all necessary activities related to the sale and redemption of securities, as well as the management of investments (hereinafter the "MFS Complex").  Indeed, as detailed below, these related entities not only nominate their own representatives to the Board of Trustees charged with the fiduciary duty of protecting the interests of investors in each individual fund, but as a practical matter, also control the appointment of the purportedly "independent" members of these boards.  In exchange for the performance of these services, these same related entities within the fund complex receive substantial fees, calculated as a percentage of the value of the total deposits under management, as set forth below.  Thus, the larger the amount of deposits under management, the more that these related entities stand to collect in fees from mutual fund investors.  This means that, even in the case in which a mutual fund loses money on its investments, the related entities can still increase the fees they earn by simply steering more investor deposits into the funds.

2.     The Parent Defendant

16.     (a)     Defendant Sun Life Financial, Inc. ("Sun Life") is the ultimate corporate parent of MFS and controls each of the entities within the MFS Complex.  Sun Life is located at 150 King Street West, Toronto, Ontario, M5H 1J9.  Sun Life is a publicly traded international financial services company with over CDN$369.6 billion under management.  Sun Life's U.S. holding subsidiary is defendant Sun Life Assurance Company of Canada – U.S. Operations Holdings, Inc. ("Sun Life Assurance"), located in Wellesley Hills, MA, which, through wholly-owned subsidiaries defendant Sun Life Financial (U.S.) Investments LLC ("Sun Life Investments") and defendant Sun Life of Canada (U.S.) Financial Services Holdings, Inc. ("Sun Life Holdings") own 93.6% of defendant MFS.

(b)     Sun Life operates and controls each of the subsidiaries and affiliates comprising the MFS Complex, including the Investment Adviser/Fund Sponsor, MFS, the Administrator, the Registrants, and the Distributor, which in turn are responsible for the operations of the MFS Funds.  Through these subsidiaries, Sun Life collected fees from the funds themselves for the services rendered, including fees generated by the wrongful conduct alleged herein.  Together, defendants Sun Life, Sun Life Assurance, Sun Life Investments and Sun Life Holdings are referred to herein as the "Sun Life Defendants."

        3.      The Investment Advisor/Fund Sponsor

17.     (a)     Defendant MFS is a wholly-owned subsidiary of Sun Life.  MFS is located at 500 Boylston Street, Boston, Massachusetts 02116.  MFS, the legal name for the registered entity doing business as MFS Investment Management, a Delaware limited liability company, is a registered investment adviser under the Investment Advisers Act of 1940 ("IAA"). MFS had ultimate responsibility for overseeing the day-to-day management, administration, operation and distribution of the MFS Funds.  Throughout the Class Period, MFS permitted select investors to engage in the market timing and late-trading of the MFS Funds at the expense of ordinary, long-term shareholders, such as Lead Plaintiff and the other members of the Class, in return for substantial fees calculated as a percentage of the average daily net assets of the MFS Funds.

        (b)     MFS, and through it the Sun Life Defendants, was paid for its services during the Class Period pursuant to investment advisory agreements negotiated between MFS and the trustees of the funds, on behalf of the MFS Funds themselves.  The MFS advisory agreements provide for the MFS Funds to pay MFS between 33 and 75 basis points (.33% to .75%) of the net assets under management, calculated on a daily basis and paid monthly, in

9

return for its investment advisory services. Thus, if a fund had an NAV of $1 billion over the course of the year, it paid MFS at least $3.3 million annually, from investors' deposits, for its investment advisory services.

18.     MFS was responsible both for the creation of the individual mutual funds (including the determination of their investment goals and strategy), as well as for managing the day-to-day activities and individual investments of the MFS Funds. MFS, or its subsidiaries or affiliates, is responsible for performing virtually all critical functions of the MFS Funds, including: (i) hiring and employing portfolio managers; (ii) selling shares in the funds to the public; (iii) performing all "back-office" operations; (iv) determining the net asset value ("NAV") of the funds on a daily basis; (v) directing and controlling the investments in the funds; (vi) ensuring that the investment policies of the funds are observed; (vii) enforcing the policies of the funds, including restrictions on trading and other activities that could be detrimental to fund shareholders; and (viii) otherwise managing the day-to-day activities of the funds. While the MFS Complex included hundreds of different individual funds during the Class Period, MFS, or its subsidiaries, were responsible for the management and day-to-day operations for all of the MFS Funds.

### 4.     The Administrator

19.     Defendant MFS also served as the Administrator for the MFS Funds, pursuant to master administrative services agreements dated March 1, 1997 and April 1, 1999 (the "Master Administrative Service Agreements"). As Administrator, MFS was responsible for performing the day-to-day administrative functions associated with the business of the MFS Funds. These tasks include: (i) performing back-office operations; (ii) calculating the NAV of the MFS Funds on a daily basis; and (iii) maintaining books and records for the MFS Funds. The Master Administrative Services Agreements were negotiated between MFS and the trustees, on behalf of

10

the MFS Funds themselves, and provided for the MFS Funds to pay MFS as much as 1.75 basis points (.0175%) of the net assets under management, calculated on a daily basis and payable monthly or quarterly, in return for its services.  Thus, if a fund had an NAV of $1 billion over the course of the year, that fund paid MFS, from investors' deposits, as much as $175,000 annually for its services, in addition to the millions of dollars also paid out of investors' deposits to MFS pursuant to the Advisory Agreement.

5.    <u>Registrants/Issuer Defendants</u>

20.    Defendant MFS Government Securities Fund was the registrant and issuer of shares for the MFS Government Securities Fund during the Class Period.  MFS Government Securities Fund was organized as a business trust under the laws of Massachusetts in 1981.

21.    Defendant Massachusetts Investors Trust was the registrant and issuer of shares for the Massachusetts Investors Trust during the Class Period.  Massachusetts Investors Trust was organized as a business trust under the laws of Massachusetts in 1924.

22.    Defendant Massachusetts Investors Growth Stock Fund was the registrant and issuer of shares for the Massachusetts Investors Growth Stock Fund during the Class Period. Massachusetts Investors Growth Stock Fund was organized as a business trust under the laws of Massachusetts on July 29, 1985.

23.    Defendant MFS Series Trust I was the registrant and issuer of shares for the following MFS Funds during the Class Period:  the Core Growth Fund, the Managed Sectors Fund, the New Discovery Fund, the Cash Reserve Fund, the Japan Equity Fund, the Strategic Growth Fund, the Technology Fund, the Research Growth & Income Fund, the Value Fund, the Global Telecommunications Fund, the Research International Fund and the Global Asset

Allocation Fund.  MFS Series Trust I was organized as a business trust under the laws of Massachusetts in 1986.

24.    Defendant MFS Series Trust II was the registrant and issuer of shares for the following MFS Funds during the Class Period: the Large Cap Growth Fund and the Emerging Growth Fund.  MFS Series Trust II was organized as a business trust under the laws of Massachusetts on September 7, 1993.

25.    Defendant MFS Series Trust IV was the registrant and issuer of shares for the following MFS Funds during the Class Period:  the Money Market Fund, the Government Money Market Fund, the Municipal Bond Fund and the Mid-Cap Growth Fund.  MFS Series Trust IV was organized as a business trust under the laws of Massachusetts on September 8, 1975.

26.    Defendant MFS Series Trust V was the registrant and issuer of shares for the following MFS Funds during the Class Period: the Research Fund, the Total Return Fund, the International Strategic Growth & Value Fund and the International New Discovery Fund.  MFS Total Return Fund was organized as a business trust under the laws of Massachusetts in 1970.

27.    Defendant MFS Series Trust IX was the registrant and issuer of shares for the following MFS Funds during the Class Period: the Municipal Limited Maturity Fund, the Limited Maturity Fund, the International Investment Grade Bond Fund, the Bond Fund, the Research Bond Fund and the Emerging Opportunities Fund.  MFS Series Trust IX was organized as a business trust under the laws of Massachusetts in 1985.

28.    Defendant MFS Series Trust X was the registrant and issuer of shares for the following MFS Funds during the Class Period: the Strategic Value Fund, the Emerging Markets Debt Fund, the Government Mortgage Fund, the New Endeavor Fund, the Global Value &

International Core Equity Fund and the Euro Equity & International Equity Fund. MFS Series Trust X was organized as a business trust under the laws of Massachusetts on 1985.

29.    Each of the MFS registrants identified above (collectively, the "Registrants") is a corporate subsidiary or affiliate of MFS and is the legal issuer of the MFS Funds within that registrant's portfolio. As such, the Registrants issued such shares to the public during the Class Period pursuant to registration statements and prospectuses issued under § 10 of the Securities Act, and are therefore absolutely liable to purchasers of the shares for any material misstatements and omissions in these prospectuses.

### 6.    The Distributor Defendant

30.    Defendant MFS Fund Distributors ("MFD"), a wholly-owned subsidiary of MFS, was the distributor for all of the approximately 104 mutual funds within the MFS family of funds. MFD is a broker-dealer registered with the SEC. MFD also served as the underwriter for the multiple funds within the MFS family of funds during the Class Period. As the underwriter, MFD is strictly liable for any material misstatements or omissions contained in the registration statement and prospectus under the Securities Act.

### 7.    Shareholder Servicing Agent

31.    Defendant MFS Service Center, Inc. ("MFSSC"), a wholly-owned subsidiary of MFS, is the shareholder servicing agent for the MFS Funds. MFSSC receives and processes shareholders' orders for transactions in the MFS Funds. Investors in the MFS Funds paid MFSSC a fee calculated as a percentage of the MFS Funds' average daily net assets at an annual rate of 0.10% during the Class Period.

### 8.    The MFS Individual Defendants

32.    (a)    Defendant John W. Ballen ("Ballen") was president of MFS from August 1998 through 2001 and was MFS's Chief Executive Officer ("CEO") from 2002 to 2003. Since

2001, he also served as a trustee of the MFS Funds. In his capacity as trustee, defendant Ballen signed each of the Registration Statement listed on Appendix B that was filed and/or became effective during 2002 and 2003. Defendant Ballen also signed the Registration Statement filed by the MFS Series Trust V on November 29, 2001; the Registration Statement filed by the MFS Series Trust IV on December 28, 2001; the Registration Statement filed by the MFS Series Trust X on November 28, 2001; and the Registration Statement filed by the MFS Series Trust IX on August 28, 2001.

(b)      As detailed herein, Ballen orchestrated the market timing activities at MFS. In particular, Ballen chose the MFS funds that would be open to market timing and negotiated the arrangements with broker-dealers and market timers. As a result of his conduct, defendant Ballen consented to the SEC's entry of an order on February 5, 2004 finding that he willfully violated antifraud provisions of the federal securities laws and ordering him to cease and desist from future violations. The SEC further ordered defendant Ballen to pay a civil money penalty of $250,000, disgorgement of $57,737 and prejudgment interest of $6,322, for a total of $314,059. Additionally, the SEC order banned defendant Ballen from any association with an investment advisor for a nine month period, beginning February 16, 2004. Furthermore, defendant Ballen was banned for a 27-month period from serving as an executive officer, trustee, or board member at MFS or any other investment advisor. For the same length of time, he was banned from performing any duties relating to the sales or administration of mutual funds.

33.      (a)      Defendant Kevin R. Parke ("Parke") was chief equity officer of MFS from August 1998 through early 2001. He was appointed MFS President in 2002 and Chief Investment Officer ("CIO") in 2001. Defendant Parke also was a trustee of the MFS Funds since early 2002. As trustee of the MFS Funds, Defendant Parke signed each of the Registration

Statements list in Appendix B hereto that was filed and/or became effective in 2002 through 2003. As a result of defendant Parke's conduct as alleged herein, in February 2004, the SEC ordered that he cease serving in these capacities at MFS.

(b)    As detailed herein, defendant Parke implemented and oversaw the illegal trading scheme at MFS, including approving and determining the amount of market timing capacity that would permitted. As a result of his unlawful conduct, defendant Parke consented to the SEC's entry of an order on February 5, 2004 finding that he willfully violated antifraud provisions of the federal securities laws and ordering him to cease and desist from future violations. The SEC further ordered defendant Parke to pay a civil money penalty of $250,000, a disgorgement of $58,853 and prejudgment interest of $6,231, for a total of $315,084. Additionally, the SEC order banned defendant Parke from any association with an investment advisor for a six month period, beginning February 16, 2004. Furthermore, defendant Parke was banned for a 30-month period from serving as an executive officer, trustee, or board member at MFS or any other investment advisor. For the same length of time, he was banned from performing any duties relating to the sales or administration of mutual funds.

9.    The Timer Defendants

a.    Canary

34.    Defendant Edward J. Stern ("Stern"), a resident of New York County, New York, was at all relevant times herein, the Managing Principal of defendants Canary Capital Partners, LLC, Canary Investment Management, LLC and Canary Capital Partners, Ltd. (referred to collectively herein as "Canary").

35.    Defendant Canary Capital Partners, LLC is a limited liability company organized and existing under the laws of the State of New Jersey, with offices at 400 Plaza Drive, Secaucus, New Jersey.

36.     Defendant Canary Investment Management, LLC is a limited liability company organized and existing under the laws of the State of New Jersey, with offices at 400 Plaza Drive, Secaucus, New Jersey.

37.     Defendant Canary Capital Partners, Ltd. is a Bermuda limited liability company.

38.     Throughout the Class Period, the MFS defendants and its subsidiaries entered into agreements with Stern and Canary, either directly or through intermediaries, that permitted them to engage in the improper market timing and late-trading of the MFS Funds, at the expense of ordinary long-term MFS investors, such as Lead Plaintiff and the other members of the Class.

<b>b.    <u>Security Brokerage, Inc.</u></b>

39.     Defendant Security Brokerage, Inc. ("Security Brokerage") was a registered broker-dealer firm registered with the SEC and located in Las Vegas, Nevada.  Security Brokerage engaged in late trading in numerous mutual fund families, including MFS.  As a result of its wrongful conduct, on September 19, 2003, Security Brokerage filed Form BDW with the SEC seeking to withdraw its broker-dealer registration.  On December 23, 2003, the SEC filed securities fraud charges against Security Brokerage in the United States District Court for the District of Nevada.

40.     Defendant Daniel G. Calugar ("Calugar") was President and 95% owner and the sole customer of Security Brokerage.  Calugar is a resident of both Las Vegas, Nevada and Los Angeles, California.  As a result of his wrongful conduct, on December 23, 2003, the SEC filed securities fraud charges against Calugar in the United States District Court for the District of Nevada.

41.     Defendants Security Brokerage and Calugar are referred to herein as the "Security Brokerage Defendants."

c.    Wilshire Associates

42.    Defendant Wilshire Associates Incorporated ("Wilshire Associates") is a global investment advisory firm with assets under management totaling more than $12.5 trillion. Wilshire Associates is located at 1299 Ocean Avenue, Suite 700 Santa Monica, CA 90401. Throughout the Class Period, Wilshire Associates engaged in market timing activity in numerous mutual fund families, including MFS.

d.    Trout

43.    Defendant Trout Trading Management Co. ("Trout") is a hedge-fund located at Rose Bank Centre, Bermudiana Road 14, Pembroke, Bernuda.  Throughout the Class Period, Trout engaged in market timing activity in numerous mutual fund families, including MFS.

10.    The Facilitator Broker Defendants

44.    Defendant Ryan Goldberg ("Goldberg") was employed by brokerage firm Brean Murray & Co. ("Brean Murray") and was actively involved in the market timing activities alleged herein.  Specifically, Goldberg offered market timing capacity in the MFS Funds to various market timers, including Canary and Trout.  In the summer of 2001, defendant Goldberg opened accounts for Canary and Trout at Brean Murray for the express purpose of market timing mutual funds, including the MFS Funds.  As a result of his illegal activity, defendant Goldberg is the subject of ongoing investigations by the offices of the New York and New Jersey Attorney Generals and the SEC.

45.    Defendant Michael Grady ("Grady") was employed by Brean Murray and was actively involved in the market timing activities alleged herein.  Specifically, Grady offered additional market timing capacity in the MFS Funds to various market timers, including Canary and Trout.  In the summer of 2001, defendant Grady opened accounts for Canary and Trout at Brean Murray for the express purpose of market timing mutual funds, including the MFS Funds.

As a result of his illegal activity, Grady is the subject of ongoing investigations by the offices of the New York and New Jersey Attorney Generals and the SEC.

46.    Defendant Canadian Imperial Bank of Commerce ("CIBC") is a Canadian financial institution with significant operations based in New York.  CIBC provided defendant Canary financing for the express purpose of market timing the MFS Funds.  At all relevant times, CIBC controlled defendant Canadian Imperial Holdings, Inc.

47.    Defendant Canadian Imperial Holdings, Inc. is a subsidiary of CIBC.  CIHI provided the financing used by Canary and the other hedge funds to market time and late trade the MFS Funds.  CIHI is located at 425 Lexington Avenue.

48.    Defendant Paul A. Flynn ("Flynn") was a Managing Director of Canadian Imperial Holdings, Inc.'s equity investments, which was part of the Equity Arbitrage Department of Canadian Imperial Holdings, Inc., a subsidiary of CIBC.  Defendant Flynn worked for Canadian Imperial Holdings, Inc., and CIBC at their New York offices.  Defendant Flynn negotiated and implemented late trading capacity in the MFS Funds for defendant Canary through defendant Security Trust Company, N.A. ("Security Trust").  Additionally, defendant Flynn negotiated and provided financing from CIBC to defendant Canary for the express purpose of timing the MFS Funds.  On February 3, 2004, he was charged criminally by the New York State Attorney General for first degree grand larceny and engaging in a scheme to defraud in the first degree.  Also that day, the SEC instituted an administrative proceeding against Flynn alleging violations of Section 10(b) and Rule 10(b)(5), and Section 17(a) of the Exchange Act.

49.    Defendant Citigroup, Inc. ("Citigroup") is the ultimate parent of the Salomon Smith Barney defendants named herein.  Citigroup is incorporated in Delaware and its principal executive offices are located at 399 Park Avenue, New York, New York 10043.

18

50.    Defendant Citigroup Global Markets Holdings Inc. ("Citigroup Global"), f/k/a Salomon Smith Barney Holdings Inc., operating through its subsidiaries, is a full-service investment banker and securities brokerage.  Citigroup Global is a subsidiary of Citigroup and the sole parent of defendant Salomon Smith Barney, Inc.  Citigroup Global is incorporated in New York with its principal executive offices at 388 Greenwich Street, New York, New York 10013.

51.    Defendant Salomon Smith Barney, Inc., now known as Citigroup Global Markets, Inc, and doing business as Smith Barney Asset Management ("SSB"), is registered as an investment adviser under the IAA.  SSB is located at 399 Park Avenue, New York, New York 10022.  SSB is also a registered broker-dealer and employer of broker-dealers and financial advisers.  SSB's broker-dealer operations are located at 388 Greenwich Street, New York, New York 10013.

52.    Defendants Citigroup, Citigroup Global and SSB shall be referred to herein collectively as "SSB Defendants."

53.    Defendant Morgan Stanley DW ("Morgan Stanley"), a broker-dealer registered with the SEC pursuant to Section 15 of the Exchange Act since 1968, is a subsidiary of the publicly traded entity Morgan Stanley.  Morgan Stanley is also a member of the National Association of Securities Dealers ("NASD").  Morgan Stanley DW's principal offices are located at 825 Third Avenue, New York, New York.

11.    The Clearing Broker Defendants

54.    (a)    Defendant Bank of America Corporation, through its subsidiary Banc of America Securities LLC (collectively "Bank of America"), is registered as a broker-dealer under the Exchange Act and an investment advisor under the IAA.  Throughout the Class Period, Bank

19

of America facilitated market timing in the MFS Funds, including timing by Canary, among others.

(b)    For example, as early as 2001, Bank of America: (1) provided Canary with a state-of-the-art electronic late trading platform, allowing it to trade late in the hundreds of mutual funds that the bank offers to its customers, including the MFS Funds; (2) provided Canary with approximately $300 million of credit to finance this late trading and market timing activity in the hundreds of mutual funds that the bank offers its customers, including the MFS Funds; and (3) sold Canary the derivative short positions it needed to time the funds as the market dropped, including the MFS Funds. All of this activity was coordinated through Bank of America broker, defendant Theodore C. Sihpol, III.

55.    Defendant Theodore C. Sihpol, III ("Sihpol") was employed as a broker in the New York office of defendant Bank of America Securities' Private Client Services ("PCS") high net-worth group and was actively involved in the market timing activities alleged herein. Specifically, defendant Sihpol facilitated the market timing and late trading transactions through Bank America. In March 2004, defendant Sihpol was indicted on 40 counts of fraud, larceny and falsifying statements in connection with his late trading and market timing activities.

56.    Defendant Prudential Financial, Inc. ("Prudential") is a publicly-owned holding company, traded on the New York Stock Exchange ("New York Stock Exchange"), whose operating subsidiaries are insurance and investment managers, including defendant Prudential Securities, Inc. At all relevant times, Prudential knowingly approved of and engaged in market timing activities in the MFS Funds, as well as numerous other fund complexes.

57.    Defendant Prudential Securities, Inc. ("Prudential Securities") is a wholly-owned broker-dealer subsidiary of defendant Prudential with its main office located in New York City.

20

On July 1, 2003, Prudential transferred its ownership in Prudential Securities to defendant Wachovia Securities, LLC, a joint venture subsidiary of defendants Wachovia and Prudential. At all relevant times, Prudential Securities knowingly cleared market timing transactions, including its own, in the MFS Funds, as well as numerous other fund complexes. As a result of its wrongful conduct, on November 4, 2003, the Massachusetts Secretary of the Commonwealth filed charges against Prudential Securities, including charges of securities fraud.

58.     Defendant Wachovia Corporation ("Wachovia"), is a publicly held North Carolina corporation traded on the New York Stock Exchange with headquarters in Charlotte, North Carolina. Wachovia is a multi-bank holding company, and is the parent of defendant Wachovia Securities. On July 1, 2003, Prudential transferred its ownership in defendant Prudential Securities to defendant Wachovia Securities, LLC, a joint venture subsidiary of defendants Wachovia and Prudential.

59.     Defendant Wachovia Securities, LLC ("Wachovia Securities"), is a private company joint venture subsidiary of defendants Wachovia and Prudential formed on July 1, 2003, when defendant Prudential transferred its ownership in defendant Prudential Securities to defendant Wachovia Securities. Specifically, Wachovia owns 62% and Prudential owns 38% of the joint venture. Moreover, Wachovia Securities is a securities broker-dealer headquartered in Richmond, Virginia and is incorporated in Delaware. From at least as early as July 1, 2003, Wachovia Securities knowingly facilitated market timing transactions, including its own, in the MFS Funds.

60.     Defendant Martin Druffner ("Druffner") was a registered representative of Prudential Securities from April 1996 to July 2003. Druffner then became a registered representative of Wachovia Securities until September 29, 2003, when he was permitted to

21

resign.  At all relevant times, Druffner served as the head of a group of broker-dealers based in Prudential Securities' Boston office who  facilitated and cleared market timing  transactions at numerous mutual fund complexes, including MFS, on behalf of six off-shore hedge funds (the "Druffner Group").  As a result of his illegal activities, on November 4, 2003, the Massachusetts Secretary of the Commonwealth and the SEC filed charges against Druffner, including charges of securities fraud.  The SEC  is seeking an order requiring Druffner to disgorge any ill-gotten gains and profits from his illegal activities.

61.    Defendant Justin Ficken ("Ficken") was a registered representative of Prudential Securities from October 1999 to July 2003.  Ficken then became a registered representative of Wachovia Securities until September 29, 2003, when he was permitted to resign.  At all relevant times, Ficken was a member of the Druffner Group and  facilitated and cleared market timing transactions at numerous mutual fund complexes, including MFS, on behalf of six off-shore hedge funds.  As a result of his illegal activities, on November 4, 2003, the Massachusetts Secretary of the Commonwealth and the SEC filed charges against Ficken, including charges of securities fraud.  The SEC is seeking an order requiring Ficken to disgorge any ill-gotten gains and profits from his illegal activities.

62.    Defendant Skifter Ajro ("Ajro") was a registered  representative of Prudential Securities from April 2001 to July 2003.  Ajro then became a registered representative of Wachovia Securities until September 29, 2003, when he was permitted to resign.  At all relevant times, Ajro was a member of the Druffner Group and  facilitated and cleared market timing transactions at numerous mutual fund complexes, including MFS, on behalf of six off-shore hedge funds.  As a result of his illegal activities, on November 4, 2003, the Massachusetts Secretary of the Commonwealth and the SEC filed charges against Ajro, including charges of

22

securities fraud. Furthermore, the SEC is seeking an order requiring Ajro to disgorge any ill-gotten gains and profits from his illegal activities.

63.    Defendant Michael Vanin ("Vanin") was a registered representative of Prudential Securities from August 1989 to November 2001. Vanin was the branch manager of Prudential's Boston office at all relevant times until November 2001. In this capacity, he approved and oversaw the market timing activities of the Druffner Group. As a result of his activities, on November 4, 2003, the Massachusetts Secretary of the Commonwealth issued charges against Vanin, including allegations of securities fraud.

64.    Defendant Robert Shannon ("Shannon"), was a registered representative of Prudential Securities from September 1996 to July 2003. Shannon then became a registered representative of Wachovia Securities until September 29, 2003, when he was permitted to resign. Shannon was the Branch Manager of Prudential's Boston office at all relevant times until November 2001. In this capacity, he approved and oversaw the market timing activities of the Druffner Group. As a result of his wrongful conduct, on November 4, 2003, the SEC and the Massachusetts Secretary of the Commonwealth issued charges against Shannon, including allegations of securities fraud.

65.    Defendant John Peffer ("Peffer") was a registered representative of Prudential Securities beginning in 1995. At all relevant times, Peffer served as the head of a group of broker-dealers based in Prudential Securities' Boston office who engaged in market timing activities at numerous mutual fund complexes, including MFS, on behalf of two off-shore hedge funds (the "Peffer Group"). As a result of his wrongful conduct, on November 4, 2003, the SEC filed charges against Peffer, including charges of securities fraud. As a result of his wrongful

conduct, on November 4, 2003, the SEC and the Massachusetts Secretary of the Commonwealth issued charges against Peffer, including allegations of securities fraud.

66.     Defendant Marc C. Bilotti ("Bilotti") was a registered representative of Prudential Securities beginning in 1999. At all relevant times, Bilotti was a member of the Peffer Group and engaged in market timing activities at numerous mutual fund complexes, including MFS, on behalf of two off-shore hedge funds. On November 4, 2003, the SEC filed charges against Bilotti, including charges of securities fraud. Furthermore, the SEC is seeking an order requiring Bilotti to disgorge any ill-gotten gains and profits from his illegal activities.

67.     The defendants defined in the foregoing ¶¶ 56 - 66 are referred herein collectively as the "Prudential Defendants."

68.     Defendant Security Trust Company, N.A., ("Security Trust"), was based in Phoenix, Arizona. Security Trust was an uninsured national banking association that provided trust and custody-related services to high net-worth individuals, private trusts and entities, and retirement plans and their administrators. As of August 31, 2003, Security Trust held $12.9 billion in assets under administration. Security Trust was instrumental in market timing of the MFS Funds by certain hedge funds, which were permitted to use the firm's electronic trading platform to execute late trades and engage in market timing. On October 29, 2003, the Federal Reserve ordered Security Trust to cease operations. On November 24, 2003, the SEC filed a complaint in the United States District Court for the District of Arizona alleging that Security Trust committed securities fraud, in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; and violated Rule 22c-1 promulgated under Section 22(c) of the ICA. Security Trust was bought by American Stock Transfer & Trust Company of New York and is now called the AST Trust Co.

24

69.     Defendant Grant D. Seeger ("Seeger") was Security Trust's CEO from 1998 until his resignation on October 5, 2003.  Seeger established the relationship with various hedge funds, including Canary, negotiated increased fees for Security Trust, and actively facilitated the late trading and market timing in the MFS Funds by various market timers.

70.     Defendant JB Oxford Holdings, Inc., a Utah corporation located in Beverly Hills, California, is a holding company that provides clearing and execution services and discount brokerage services.  JB Oxford Holdings, Inc, is the parent of JB Oxford & Co. and defendant National Clearing Corporation.  Through its subsidiaries, JB Oxford Holdings, Inc., entered into numerous agreements with its customers that enabled its customers to engage in late trading and market timing activities in over 600 mutual funds, including the MFS Funds.

71.     Defendant National Clearing Corporation ("NCC"), a wholly-owned subsidiary of defendant JB Oxford Holdings, Inc., is located in Beverly Hills, California.  NCC is a broker-dealer registered with the SEC.  Prior to April 2003, JB Oxford Holdings, Inc. had one subsidiary, JB Oxford & Co.  On or about April 2003, JB Oxford & Co. was reorganized into two subsidiaries – JB Oxford & Co., which served as a retail brokerage firm, and defendant NCC, which served as a clearing firm.  Defendant NCC clears transactions for correspondent brokers, including JB Oxford & Co., hold funds and securities for JB Oxford & Co., and handles institutional business previously handled by JB Oxford & Co.  NCC entered into numerous agreements with its customers that enabled its customers to engage in late trading and market timing activities in over 600 mutual funds, including the MFS Funds.  Through its participation in the late trading and market timing activity alleged herein, defendant NCC realized almost $1 million in proceeds from compensation arrangements with its customers who engaged in late trading and market timing and allowed those customers to reap at least $8 million in profits at the

25

expense of long-term mutual fund shareholders. Defendant NCC is the current name of the entity engaged in the market timing and late trading activity alleged herein.

72.     Defendant James G. Lewis ("Lewis") was a member of the board of directors, the President and Chief Operating Officer ("COO") of JB Oxford Holdings, Inc. from 1999 until his resignation in April 2004. Lewis was President and CEO of JB Oxford & Co. and NCC from 1999 until his resignation in December 2003. Lewis, along with defendant James Y. Lin, negotiated the agreements by which NCC enabled its customers to engage in late trading.

73.     Defendant Kraig L. Kibble ("Kibble") has been defendant NCC's Director of Operations since September 2002. From January 2002 until his promotion in September 2002, defendant Kibble was the Assistant Vice President of Operations. In his position as the Assistant Vice President of Operations, defendant Kibble supervised NCC's mutual fund department and oversaw the trading by NCC's customers. Throughout 2002 until August 2003, Kibble reported to defendant Lewis. Defendant Kibble transmitted and approved the transmittal of NCC's customers late trades to the mutual fund complexes, including MFS.

74.     Defendant James Y. Lin ("Lin") has been the Vice President of Correspondent Services at JB Oxford & Co. and NCC since at least May 2002. In that position, defendant Lin is responsible for attracting additional correspondent brokers and negotiating clearing agreements between those brokers and NCC. From at least May 2002 through December 2003, Lin reported directly to defendant Lewis. Defendant Lin, along with defendant Lewis, negotiated the agreements by which NCC enabled its customers to engage in late trading.

75.     Defendant Bear Stearns & Co., Inc. ("BSC") is a global investment bank and securities trading and brokerage firm, with its principal executive offices located at 383 Madison Avenue, New York, New York 10179.

26

76.    Defendant Bear Stearns Securities Corp., ("BSS") is a Delaware corporation with its principal offices located at 383 Madison Avenue, New York, NY 10179.  BSS is a broker-dealer and affiliate of BSC.

77.    Defendants BSC and BSS are collectively referred to herein as the "Bear Stearns" defendants.

78.    Defendant Charles Schwab & Co. ("Schwab") is a Delaware corporation with its principal offices located at 120 Kearny, 4th Floor, San Francisco, CA  94104.

79.    Defendant Credit Suisse First Boston (USA) Inc. ("CSFB") is a Delaware corporation with its principal offices located at Eleven Madison Avenue, New York, NY 10010.

80.    Defendants Bank of America, Bear Stearns, Schwab, CSFB, Prudential, Security Trust, NCC, and SSB are collectively referred to herein as the "Clearing Broker Defendants." As explained in detail below, the Clearing Broker Defendants participated in market timing and late trading by transacting wrongful trading activity across the mutual fund industry, including MFS, and by engineering and implementing market timing and late trading strategies and schemes for the Timer defendants, and their brokers.  The Clearing Broker Defendants earned substantial fees and other compensation for their participation in the wrongful mutual fund trading schemes described in detail herein.

12.    Financier Defendants

81.    Defendant JP Morgan Chase and Co. ("JPM") is a Delaware corporation, with its principal offices located at 270 Park Avenue, New York, New York 10017.

82.    Defendant JPM, together with previously named defendants Bank of America, Bear Stearns, CIBC and CSFB (in their capacities as financiers of market timing and late trading), are referred to collectively herein as the "Financier Defendants."  As explained in detail

herein, during the Class Period the Financier Defendants were lenders to market timers and late traders, including Canary, for the purpose of market timing and shorting mutual funds, including MFS Funds.

>    C.    The John Doe Defendants

83.    The true names and capacities of defendants sued herein as John Does 1 through 100 are other active participants with the above-named defendants in the widespread unlawful scheme alleged herein whose identities have yet to be ascertained.    Such defendants were secretly permitted to participate in the market timing and late trading activities detailed herein. Lead Plaintiff will amend this Complaint to state the true names and capacities of said defendants when they have been ascertained.

IV.    FACTUAL ALLEGATIONS

>    A.    Overview Of Market Timing/Late Trading Practices

>    >    1.    Background Information
>    >    And The Forward-Pricing Rule

84.    Market timing/late trading opportunities stem from inefficiencies in the manner in which shares of individual mutual funds are priced.    Shares of open-end mutual funds are priced daily, based on their NAV at the time of the valuation.    Unlike equity or debt securities that are valued and traded on stock exchanges, open-end mutual funds continuously issue new shares as new investments are received, and redeem shares as investors withdraw assets.    The value of these shares is calculated at 4:00 p.m. Eastern Time ("ET") each day (the close of trading on the New York Stock Exchange ("New York Stock Exchange")), by determining the NAV of the fund (the value of assets less liabilities), and then dividing that amount by the number of shares outstanding.    For example, if a mutual fund with 100,000 shares outstanding holds total assets

with an NAV of $1 million, then it will be priced at $10 per share.  Thus, an investor seeking to

invest $1,000 in this fund would receive 100 newly issued shares, valued at $10 per share.

85.    Since MFS Funds shares are only priced once per day, the potential exists for an

investor to purchase shares at a "stale" price that does not incorporate the latest information, and

thereby make a quick profit.  For example, if an investor were able to purchase shares of a

mutual fund at the NAV calculated before his purchase, with knowledge that the investments

held within the fund had risen in value before the next NAV calculation, he could make a risk-

free profit by simply buying the shares and then selling them the next day at the new, higher

NAV.

86.    To prevent this arbitrage opportunity, the SEC enacted Rule 22c-1 under the ICA,

which provides as follows:

> No registered investment company issuing any redeemable security, no person
> designated in such issuer's prospectus as authorized to consummate transactions
> in any such security, and no principal underwriter of, or dealer in, any such
> security shall sell, redeem, or repurchase any such security except at a price based
> on the current net asset value of such security *which is next computed after
> receipt of a tender of such security for redemption or of an order to purchase or
> sell such security* . . .

(emphasis added)

87.    Under Rule 22c-1, (also known as the "forward-pricing rule"), MFS mutual fund

investors who place orders to purchase fund shares during trading hours do not know the exact

price at which their orders will be executed; instead, these orders are executed at the NAV

calculated after the order is received, at the 4:00 p.m. close of trading on the New York Stock

Exchange.  Thus, all investors should have the same opportunity to digest "pre-4:00 p.m.

information" before they buy or sell, and no investor should have the benefit of "post-4:00

information" prior to making an investment decision.  Further, an investor who can avoid

forward pricing and buy at the prior NAV has a significant trading advantage, since he can wait

29

until after the market closes for significant news such as a positive earnings announcement to come out, and then buy the fund at the old, lower NAV that does not yet reflect the positive news.

>    2.    Subverting The Forward-Pricing Rule
>           Through Market Timing And Late Trading

88.    The forward-pricing rule alone, however, does not eliminate the arbitrage opportunity for frequent traders in mutual funds. This is due to the fact that the NAV of the fund, as calculated after the investor purchases his shares, still might not incorporate all public information.

89.    A typical example is a U.S. mutual fund that holds Japanese shares. Due to time zone difference, the Japanese market may close at 2:00 a.m. ET. If the U.S. mutual fund manager uses the closing prices of the Japanese shares in his fund to calculate a NAV at 4:00 p.m. ET, he is relying on market information that is fourteen hours old. Any positive market moves during the New York trading day that will likely cause the Japanese market to rise when it later opens will not be reflected in the "stale" Japanese prices, and thus the overall fund's NAV will be artificially low.

90.    "Market Timing" is the practice of trying to take advantage of this information delay in the pricing of mutual funds. Specifically, a market timer who purchases the Japanese fund described above, at the "stale" price is virtually assured of a profit that can be realized the next day by selling. Taking advantage of this kind of short-term arbitrage repeatedly in a single mutual fund is called "timing" the fund.

91.    Market Timing opportunities are not limited to mutual funds holding foreign investments, but instead also arise in mutual funds containing relatively illiquid securities such as high-yield bonds or small capitalization stocks. In such cases, the fact that some of the fund's

securities may not have traded for hours before the New York Stock Exchange closing time can render the fund's NAV stale, and thus open to being timed.

B.    Material Misstatements And Omissions In The
MFS Prospectuses Concerning Market Timing

92.    Throughout the Class Period, in connection with the offering of the MFS Funds, the MFS Registrants filed with the SEC and released to the public over 83 registration statements, each incorporating, either explicitly or by reference, prospectuses, prospectus supplements and/or amendments thereto covering the sale of these MFS Funds to the public (collectively, the "MFS Prospectuses").    Additionally, the MFS Registrants filed some 744 supplemental statements of information (each filed as SEC Form 497, "Definitive Materials") during the Class Period.  A complete list of the MFS Prospectuses is attached as Appendix B.

93.    Although the disclosures in the MFS Prospectuses were modified during the Class Period, each of the prospectuses referred to above failed to disclose that MFS permitted market timing and late trading in its mutual funds.  To the contrary, these prospectuses warranted that MFS did "not permit market timing."  For example, prior to 2001, the MFS Prospectuses, under the heading "MFS Excessive Trading Practices" categorically stated the following:

> The MFS funds *do not permit market timing* or other excessive trading practices. Excessive, short-term (market-timing) trading practices may disrupt portfolio management strategies and harm fund performance.  As noted above, the MFS funds reserve the right to reject or restrict any purchase order (including exchanges) from any investor.  *To minimize harm to the MFS funds and their shareholders*, the MFS funds will exercise these rights if an investor has a history of excessive trading or if an investor's trading, in the judgment of the MFS funds, *has been or may be disruptive to a fund*.  In making this judgment, the MFS funds may consider trading done in multiple accounts under common ownership or control.

(emphasis added)

94.    Moreover, the MFS Prospectuses after the beginning of 2002 contained the following disclosure appearing under the heading "Excessive Trading Practices":

31

The MFS funds **do not permit market-timing or other excessive trading practices** that may disrupt portfolio management strategies and harm fund performance. As noted above, the MFS funds reserve the right to reject or restrict any purchase order (including exchanges) from any investor. The MFS funds will exercise these rights, including rejecting or canceling purchase and exchange orders, delaying for up to two business days the processing of exchange requests, restricting the availability of purchases and exchanges through telephone requests, facsimile transmissions, automated telephone services, internet services or any electronic transfer service, if an investor's trading, in the judgment of the MFS funds, has been or may be disruptive to a fund. In making this judgment, the MFS funds may consider trading done in multiple accounts under common ownership or control.

(emphasis added)

95.    The MFS Prospectuses prior to January 2001 also stated the following:

Exchanges may be subject to certain limitations and are subject to the MFS funds' policies concerning excessive trading practices, which are **policies designed to protect the funds and their shareholders from the harmful effect of frequent exchanges**. These limitations and market timing policies are described below under the captions "Right to Reject or Restrict Purchase and Exchange Orders" and "Excessive Trading Practices."

(emphasis added)

96.    In addition, the MFS Prospectuses further stated that MFS would restrict trades in

the best interest of investors as follows:

The MFS funds each reserve the right to reject or restrict any specific purchase or exchange request. Because an exchange request involves both a request to redeem shares of one fund and to purchase shares of another fund, the MFS funds consider the underlying redemption and purchase requests conditioned upon the acceptance of each of these underlying requests. Therefore, in the event that the MFS funds reject an exchange request, neither the redemption nor the purchase side of the exchange will be processed.

97.    The MFS Prospectuses also assured investors that late trading in its funds was

strictly prohibited:

You will receive the **net asset value next calculated**, after the deduction of applicable sales charges and any required tax withholding, if your order is complete (has all required information) and MFSC receives your order by:

32

the valuation time [defined by MFS as 4:00 p.m. ET], if placed directly by you (not through a financial adviser such as a broker or bank) to MFSC; or MFSC's close of business, if placed through a financial adviser, ***so long*** as the financial adviser (or authorized designee) received your order by the valuation time [i.e., by 4:00 p.m. ET].

(emphasis added)

98.    Each of the representations referred to above was materially false and misleading, or omitted to state facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.  Specifically, defendants failed to disclose that:  (a) the MFS defendants had entered into agreements permitting select investors to engage in market timing of the MFS Funds; (b) pursuant to these secret agreements, the select investors regularly timed the MFS Funds shares; (c) defendants regularly allowed, and had entered into agreements which allowed, certain investors to engage in trades that were disruptive to the efficient management of the MFS Funds and/or increased the MFS Funds' costs, thereby harming the MFS Funds' actual performance; (d) the amount of compensation paid by the MFS Funds to MFS, because of the increased net assets under management due solely to the illegal market timing funds deposited by the timers into the MFS Funds, provided substantial additional compensation to MFS by the MFS Funds and its shareholders, including Lead Plaintiff and other members of the class; and (e) pursuant to these agreements, the MFS defendants benefited financially at the expense of the ordinary MFS Fund investors, including Lead Plaintiff and other members of the Class.

C.    The Defendants' Knowledge And Direct
        Participation In The Wrongful Conduct

99.    Investigations by Lead Plaintiff, federal regulators, and journalists across the country, as well as interviews with Timing Witness #1, have uncovered a well-organized, systematic approach to market timing and late trading in the MFS Funds throughout the Class

33

Period involving the most senior levels of MFS management. Ordinary investors were never informed of these arrangements nor the preferential treatment granted to certain investors. Rather, defendants expressly represented that such arrangements were prohibited and publicly marketed the MFS Funds as long-term investments. Specifically, MFS never disclosed that throughout the Class Period it expressly permitted numerous investors to market time at least $2 billion in MFS funds – one of the largest amounts of market timing uncovered at any fund family. As described in more detail bellows, the defendants knew that the market timing and late trading was "very disruptive" and "could harm the performance of the funds due to higher trading costs as the funds buy and sell due to cash changes."

        1.    <u>Market Timing at MFS</u>

        a.    <u>Overview</u>

100. The market timing and late trading at MFS was the direct result of the MFS defendants' deliberate plan to increase fees by increasing assets under management. MFS's most senior managers, including defendants Ballen and Parke, instituted the formal polices and procedures for approving and monitoring the market timing arrangements by designating the MFS funds that MFS would permit to be timed. As numerous documents and witnesses revealed, the MFS defendants negotiated the terms of the market-timing capacity with broker-dealers and select investors, and then monitored and managed the arrangements throughout. In fact, market timers referred to MFS as the "fast food of the timing world" because of its centralized management, structured distribution, and ubiquitous availability of capacity through numerous broker dealers.

101. Indeed, after Ballen chose the list of MFS funds for timing, Parke was responsible for monitoring the market timing activity within the MFS funds. Parke was also responsible for establishing the amount of market timing permitted in the MFS funds during the Class Period.

Defendants referred to the MFS funds available for timing as the "Unrestricted Funds," meaning that MFS permitted market timing "even if a pattern of excessive trading has been detected."

102.     To ensure the increase in net assets under management, and the resulting increase in fees, MFS required that the timers maintain their assets in certain MFS money market funds when not being used for market timing, enabling MFS to draw billions of dollars to its funds, thereby increasing the fees MFS was paid out of the deposits of the innocent investors.

103.     Throughout the Class Period, MFS was well aware of the market timers' practices, routinely communicating with brokers and known timers about the specific details of the timing activity.  As detailed below, numerous documents reveal that the brokers and timers provided MFS with precise knowledge of impending market timing trades.  In fact, some timers actually provided MFS with details of their timing models.

104.     In addition to providing capacity in the MFS Funds, the MFS defendants also provided brokers with portfolio information that the brokers clients' used to profit from hedging against the funds.  As frequently as once a month, the MFS defendants provided brokers with highly confidential proprietary information.  For instance, in a November 20, 2002 email from Michelle Tartalio, of Brean Murray, to Carlos Brussa, of MFS, she wrote:

> Hey Carlos!  Thanks for the information you sent over to me.  Like last month, if you don't mind sending me the holdings for the Emerging Growth and Research Funds, I would greatly appreciate it.  If you don't mind, not just the top holdings but the whole list!  Thank you!!!

105.     Within minutes, MFS's Brussa sent the broker the MFS Emerging Growth Fund Portfolio holdings  Similarly, numerous documents reveal that timers like Canary routinely obtained MFS's portfolio information, which they used for their hedging strategies.

106.     MFS also created arbitrage opportunities for certain of its market timers by allowing late trading in MFS funds, in violation of the forward-pricing rule and its stated

35

policies. As explained above, the forward-pricing rule requires that in order to receive the NAV calculated as of 4:00 p.m. ET, an order had to be placed before the New York Stock Exchange closing. MFS, however, permitted certain market timers to trade the MFS funds after the New York Stock Exchange close, but at the 4:00 p.m. NAV, with the benefit of information that would impact the following day's NAV. In fact, MFS was very specific about how late trades were to be executed. For example, in arranging market-timing capacity, MFS required that the trades had to be cleared between 6:00 p.m. and 6:50 p.m. ET, even if entered after 4:00 p.m., and still get that day's NAV. To facilitate the late trading, MFS informed market timers that they could use either a broker-dealer or a third-party administrator to process the late trades through the NSCC system, even providing recommendations to the timers of a company to use.

b.     Specific Examples Of Timing At MFS

(1)     Canary

107.     According to Timing Witness #1 and internal MFS documents, Canary obtained at least $200 million in timing capacity in five MFS Funds through at least four broker-dealers, including Bank of America and Brean Murray. As required by MFS, Canary kept hundreds of millions of dollars of trading assets within the MFS family, assuring MFS that it would collect fees on the timing assets, whether the money was "invested" in the Timed Funds, or some other MFS Fund.

108.     Throughout this period, the MFS defendants actively negotiated capacity with Canary and its representatives. For instance, handwritten notes of an MFS employee recorded precisely when and how much of Canary's timing assets would be moving into the MFS Funds. For example, handwritten notes memorializing a discussion between defendant Goldberg, a broker for Canary, and an MFS representative, stated that Canary was seeking "small cap, mid, tech, Managed Sector any global – he won't be > 3% of fund & likes that to be $5-$10MM and

36

up."  In this exchange, Goldberg also informed MFS that Canary had "$1 B w/ negotiated capacity w/ 1 fund . . . huge opps in other areas," in an effort to induce MFS to extend timing capacity to his client.

109.   In addition, in August 2000, Canary considered redeeming shares in the MFS Emerging Growth Fund that it had purchased just a week before.  Concerned about potentially losing its capacity because of its quick departure from the fund, Canary asked the broker how MFS would respond.  In an August 17, 2000, email response, the broker replied, "No. . . .  I spoke to the rep who I have known from the other place that I was doing this at and she told me that I did not have to worry about MGEGX [the Emerging Growth Fund] at all,"  making it clear that frequent trades were part of the deal at MFS.

110.   Moreover, the MFS defendants knew that Canary was indeed timing its funds.  For instance, handwritten notes of an MFS employee made during the Class Period recorded precisely when and how much of Canary's timing assets would be moving into the MFS Funds.  For example, the notes stated that "Stern Family coming in w/ $60MM next wk – B of A is trading platform – # of accounts w/ $4MM max."

### (2)    Security Brokerage, Inc.

111.   Defendant Security Brokerage was a Las Vegas-based broker-dealer run by defendant Calugar, who was also the firm's sole client.  Security Brokerage's participation in the market timing and late trading scheme involved $400-$500 million traded in various mutual fund families, including as much as $250 million in the MFS Funds alone.  Over the two years in which Calugar market timed mutual funds, including the MFS Funds, he made $175 million in profits.

112.    Throughout this period, MFS knew that Calugar was timing its funds.   For instance, on March 6, 2001, Calugar wrote an email to Andre Behran of MFS setting forth a detailed proposal for market timing capacity in certain MFS Funds:

> I am writing to see if there is any possibility of our taking positions in a number of specific MFS Funds that I have listed at the end of this letter.  The offer that I have described below I believe will distinguish Security Brokerage from almost all other market timers, because as I described below, we think we are in a position to compensate MFS the costs of our timing activity….

Calugar went on to provide specifics of how the illegal trades would be placed.   He then explained to the MFS defendants that if "there is sufficient capacity at MFS, we are prepared to undertake transactions of this type with $50 million, which would generate annual distributor fees of $1.75 million."

113.    MFS negotiated and extended hundreds of millions of dollars in capacity to Security Brokerage during the Class Period.   For instance, in April 2003, Calugar requested that MFS permit him to increase his capacity by a total of $129 million, as reflected in an April 28, 2003 email entitled "New Investments," directed to an MFS representative:

> I wanted to ask if you could see whether it would be permissible for me to place some additional investments with MFS in the Mass Investment Trust (MITTX, and in MFS Total Return Fund (MSFRX).  I believe that the Total Return Fund is a fund that you had identified previously to me as one in which MFS permits trading, but at the time, I did not have funds to make an investment.

> *      *      *

> If it is feasible, I would like to make an additional $44 million investment in MITTX to bring my total investment in MITTX up to $70 million . . .  I would like to make an investment of $85 million in MSFRX.

> If you give me the OK, I would be in a position to make the new investments early in May.  If the amounts I have requested are too large, and smaller amounts would be feasible, please let me know that as well.

114.    Within three days, the MFS defendants approved Calugar's request for the capacity.  Specifically, on May 1, 2003, Calugar emailed MFS to both confirm that the capacity had been granted and to express his appreciation for MFS' cooperation:

> thank you for the prompt way that you handled my request, and the approvals you received for me to make additional investments of $44 million in MFS Mass Investment Trust (MITTX) and $85 million in MFS Total Return Fund (MSFRX)…. It is really a privilege to be able to work with you and to be able to invest with MFS.

115.    In this email, Calugar also indicated that Security Brokerage would deposit "sticky assets" in the MFS Funds.  Calugar wrote that he would invest $70 million in the MFS High Income Fund and/or the MFS Municipal Limited Maturity Fund that would be "'buy and hold' investments."  This offer met with the approval of MFS, as reflected in a May 2, 2003 internal MFS email from Tom Jessee, an employee in the MFD broker-dealer department, to James Fitzgerald ("Fitzgerald"), then President of MFD, entitled "Timer":

> "Calugar, a known timer, has asked us to take $75 million in Limited Maturity as a long term holding (longer than 1 year) and an additional $50 million in Total Return which he admittedly will time as he has historically with us . . . . This is not a unique situation.  I have had several timers propose the same arrangement to me.  Your thoughts?"

Ultimately, both Fitzgerald and Martin Beaulieu, an MFS executive vice president and director of MFD, approved Calugar's deposit of sticky assets.

(3)    Wilshire Associates

116.    Market timing was not limited to hedge funds or large individual investors.  In fact, Wilshire Associates, one of the nation's largest and most influential asset managers, engaged in market timing for nearly a decade in numerous mutual funds, including the MFS Funds.  Wilshire typically engaged in rapid fire trading of hundreds of millions of dollars at a time spread over numerous fund families.  Additionally, Wilshire borrowed over $100 million

from others for the express purpose of leveraging its market timing strategy. Ultimately, the strategy was highly profitable, and in some years generated returns in excess of 100%.

117.    MFS, as well as other fund families, provided Wilshire access to their funds for the express purpose of market timing. In fact, Wilshire did not sneak into funds to trade. As reported in an October 1, 2003 Money magazine article entitled the Great Fund Rip-Off, Wilshire's CEO Dennis Tito "openly told the funds he was going to trade frequently." In turn, investment managers like MFS stood to gain from a relationship with Wilshire, who recommends to pension funds and endowments which investment managers to choose to oversee their billions of dollars in holdings.

> Moreover, documents and witnesses reveal that MFS knowingly permitted Wilshire to time its funds. Wilshire was one of the biggest timers in the MFS Emerging Growth Fund. In addition, internal MFS documents reveal that Wilshire was at times the most aggressive, and perhaps the most damaging, market timer at MFS, redeeming trading shares more frequently then other timers. While other fund firms banned Wilshire from trading, despite knowing this information, MFS permitted Wilshire's trading to continue throughout the class period.

2.    Facilitator Broker Defendants'
        Participation In The Wrongful Conduct

a.    Overview

118.    Throughout the Class Period, the Facilitator Broker Defendants acted as "middlemen" between the MFS Complex and the market timers, collecting substantial fees from both sides. Specifically, these brokers negotiated for and obtained timing capacity from MFS, and then sold this capacity to market timers. In return, the brokers received substantial fees and other compensation both from the timers and from MFS, as a percentage of the assets invested in the timed funds. These same brokers then leveraged their relationship with MFS by steering additional, long-term investors into the timed funds, without disclosing to these investors either

the market timing and late trading activity, or the adverse impact that these activities had on long-term investors.

b.       <u>Examples Of The Wrongful Conduct</u>

i.       <u>Brean Murray</u>

119.    Defendants Goldberg and Grady, principals of Brean Murray, were broker dealers who negotiated capacity in the MFS funds for the purpose of "selling" it to known timers. As compensation for the timing capacity negotiated, Brean Murray charged "wrap fees" to these timers totaling as much as $50,000 per month during the Class Period. For example, the September 2001 wrap fees charged to Canary by Goldberg and Grady, through Brean Murray, were $54,824 on total assets of $127,325,625, including significant assets in the MFS Funds.

120.    Both Goldberg and Grady had an open dialogue with MFS regarding their timing activities. For example, in a November 2, 2001 letter from defendant Goldberg to Brian Roach, Assistant Vice President and Associate Director of MFS Investment Management, Goldberg explicitly asked for timing capacity in certain MFS Funds for two of his hedge fund clients, defendants Canary and Trout. In making this offer, Goldberg was very clear about what he was looking for – timing capacity – and how much of it he needed:

> We are proposing a relationship whereby our clients, Canary Management, LLC and Trout Trading Management Co., have approval from your firm to trade on a short-term basis in some of the MFS funds that are normally restricted from short term trading. Our proposal is based on capacity of up to three percent of these funds for trading on a short-term basis. Short term trading can be defined as trading four to five round trips per calendar month.

121.    In exchange for the capacity, Brean Murray was willing to have their clients deposit long-term "sticky assets" into the MFS fund complex. For instance, in his November 2, 2001 letter, Goldberg stated:

> Additionally, Canary and Trout will make a commitment of long-term assets to a MFS bond fund, a MFS money market fund or to the fund that is being traded.

41

Our clients are generally comfortable with depositing 25% of the total trading assets into the long-term assets placed in a bond, money market or mutual fund with a long-term investment in an internal hedge fund. There is also the possibility of our clients making the deposit of long-term assets into a separate managed account with a fee that you deem acceptable.

122.    Moreover, MFS's senior executives were aware of, and approved, the agreements with Brean Murray. For example, on July 3, 2002, Jim Sweeney, an MFS "Investment Management Consultant" who served as a sales representative responsible for certain brokers' accounts, in an email entitled "timing policy," informed his clients, defendants Grady and Goldberg, that their request for additional timing capacity was approved, but only in part. Rather than grant them the full request for $45 million in capacity at that time, Sweeney explained that defendant Parke had approved $20 million of the request, but would consider raising the amount in the coming months:

This is to follow up the conversation I had with Mike [Grady] yesterday regarding your desire to add as much as $45 million to the unrestricted MFS funds.

Given the amount that you already have in these funds, I checked with our senior people in Boston to see whether the proposed additional investment might create any problems. Our Chief Equity Officer, Kevin Parke, responded that with all that is going on at this time we would be more comfortable with an additional $20 million but not the full $45 million.

He did say that you should check back with us in a month or so to see if conditions at that time would make us feel more comfortable with the additional money.

ii.    <u>CIBC</u>

123.    The CIBC defendants knowingly steered market timers to the MFS Funds for the purpose of market timing. Furthermore, during the Class Period, MFS knew of CIBC's market timing activities.

124.    For instance, in April 2000, defendant CIBC, as a representative of defendant Canary, negotiated market timing capacity in the MFS Funds to be traded through defendant

Security Trust's platform.  In particular, defendant Flynn contacted defendant Seeger regarding Security Trust's ability to provide market timing capacity and late trading in various mutual funds, including the MFS Funds.  CIBC had identified Security Trust as an excellent trading platform for Canary and Samaritan to market time because the platform allowed for late trading.

125.    CIBC advised the hedge funds to time the MFS Fund by using the Security Trust platform.  In fact, in September 2001, defendant Flynn conducted due diligence of Security Trust's electronic trading platform.  Flynn memorialized his findings in an October 12, 2001 memorandum, describing the benefits of using Security Trust's "Same Day/Late Day Trading Platform:" "[A] pricing list is prepared by the company and submitted to our clients who are then able to run their timing models against actual closing process instead of the previous day before they submit trades."  Ultimately, as much as 99% of the trades were transmitted to Security Trust after 4:00 p.m.ET, and as many as 82% of their trades were transmitted between 6:00 p.m. and 9:00 p.m.

126.    Furthermore, the MFS defendants knew that CIBC was engaging in market timing related activities, including that CIBC controlled over $183 million in timing capacity at MFS in 2002 alone.  In addition, MFS internal documents reveal that at least one other CIBC broker controlled tens of millions of dollars in capacity in MFS funds.  Nevertheless, MFS permitted CIBC to continue its illegal trading through 2003.

127.    Moreover, CIBC further facilitated the market timing and late trading in the MFS Funds.  In particular, defendant Flynn arranged for CIBC to lend Canary and Samaritan large sums of money for the express purpose of market timing the MFS Emerging Growth Fund.  Specifically, Flynn negotiated and structured swap and loan agreements through CIBC to provide the hedge funds with financing to trade mutual fund shares with financial leverage.

43

### iii.    <u>Salomon Smith Barney</u>

128.    In addition, MFS was part of SSB's "Strategic Partners Program," wherein MFS paid SSB monies in addition to existing up front commissions, 12b-1 trailing commissions paid after the initial sale, shareholder servicing fees and account maintenance fees.  Specifically, through the market timing and late trading activities, and the resultant large infusions of cash paid by investors, including Lead Plaintiff and other members of the Class, MFS gained significant sums that it used to steer investors into the MFS Funds, thus further increasing the net assets under management and the fees collected on those assets.  Pursuant to the Strategic Partners Program, MFS made these additional payments to SSB in exchange for SSB directing its clients, and the market timers, into the MFS Funds.

129.    As described above, in return for these payments and the shelf space, MFS received: (i) identification of their funds on an internal list distributed to all SSB brokers over the firm's corporate intranet; (ii) a higher profile in SSB's sales system than non-participating fund complexes, including procedures making it easier for SSB brokers to process sales of shares in participating funds than non-participating funds; and (iii) the ability to market their funds directly to SSB brokers.

130.    These practices were intimately connected to the market timing and late trading activities throughout the mutual fund industry, including MFS.  In particular, MFS paid improper fees to brokers and brokerage firms, including SSB, to attract additional market timing assets to the fund complexes.  Moreover, the increased transaction costs incurred by MFS as a direct result of the sophistication required of the portfolio managers to accommodate the market timing activity resulted in excessive management and advisory fees being charged to the innocent long-term investors, including Lead Plaintiff and the other members of the Class.

### iv.    <u>Morgan Stanley</u>

131.    Similarly, MFS also paid Morgan Stanley to bring market timers into the MFS Funds. Specifically, Morgan Stanley negotiated timing capacity in the MFS Funds directly with MFS, and would then market and sell that capacity to market timers in exchange for the fees paid to Morgan Stanley by MFS. MFS entered into arrangements with Morgan Stanley as part of the broker's "Partners Program," whereby MFS paid excess fees in return for additional shelf space. MFS never disclosed the nature of these payments to its investors.

3.      The Clearing Broker Defendants'
        Participation In The Wrongful Conduct

a.      Overview

132.    The active collaboration in and facilitation of market timing and/or late trading by financial institutions, acting as clearing platforms for market timing and late trading, was central to the success of the Trader and Broker defendants' scheme. During the Class Period, many of the largest financial firms in the country, including defendants Bank of America Corp. and Banc of America Securities LLC ("Bank of America"), Bear Stearns, Schwab, CSFB, Security Trust and Prudential (hereinafter the "Clearing Broker Defendants") acted as key conduits of the market timing/late trading activities described herein. The Clearing Broker Defendants serviced both brokers who specialized in timing (including brokers from within the ranks of the Clearing Broker Defendants, who often earned as much as $15 million a year in commissions from timing activities alone) and timers directly.

133.    The Clearing Broker Defendants disregarded the excessive mutual fund trades being transacted through their trading systems, or "platforms," by the market timers and they substantially assisted and participated in such excessive trading. Moreover, the Clearing Broker Defendants specifically engineered trading strategies that catered exclusively to timers and late traders. For instance, Prudential developed a "shotgun" system that allowed a market timer to

45

scatter trades across various mutual funds to enable the timers to successfully execute larger and more frequent trades over a wide variety of fund complexes. Other Clearing Broker Defendants, such as Bear Sterns and Bank of America actually installed special equipment for timers and their brokers to allow them to execute market timing and late trading transactions themselves, while the Clearing Platform Defendants captured the resulting fees and commissions.

134.    The Clearing Broker Defendants were motivated to engage in such conduct by the many sources of income offered by opening their execution systems to market timers and late traders, including the fees and commissions (including contingent deferred sales charges, or "CDSCs") they received for processing the market timer and late trading transactions. The Clearing Broker Defendants also benefited from their role as the executors of market timing and late trading by leveraging various quid pro quo benefits from market timers and timing brokers, including the ability to cross-sell other products and services they offered to the timers and brokers, including financing and private client services. By collecting such fees and other benefits, the Clearing Broker Defendants directly benefited from the rapid in-and-out trading by certain of the market timers, while harming long-term fund investors who bore the transaction costs and other harms, as described herein, of such excessive trading.

b.    Examples Of The Wrongful Conduct

i.    Bear Stearns

135.    Throughout the Class Period, Bear Stearns in its role as a clearing broker-dealer facilitated market timing throughout the mutual fund industry. Bear Stearns actively facilitated the illegal trading of mutual funds by knowingly permitting its affiliated broker-dealers to execute market timing and late trades over its clearing platform. Bear Stearns's use of its platform involved trading in several mutual fund complexes, including at least Alliance, Fremont, Invesco, MFS, PBHG, Pimco, and Van Eck. Moreover, Bear Stearns' employees

46

expressly approved this trading, and actively communicated with various market timers and mutual fund firms to further the illegal trading via the firm's platform.

136.    Bear Stearns knowingly facilitated the market timing and late trading through a network of introducing broker-dealers, to whom Bear Stearns provided access to its clearing platform.  Bear Stearns' network of broker-dealers included Brean Murray and Kaplan & Co., which had core businesses of market timing mutual funds on behalf of hedge fund clients. Additionally, certain in-house broker-dealers at Bear Stearns were known to use its platform for market timing and late trading.

137.    Specifically, senior Bear Stearns employees approved the use of the firm's trading platform for this purpose.  For instance, during the Class Period, representatives of Brean Murray met with Zackman of Bear Stearns to specifically discuss arranging market-timing and late-trading capabilities through the firm's platform.  This meeting resulted in Bear Stearns installing a computer in Brean Murray's offices that accessed its trading platform, known internally as the Bear Stearns Mutual Fund Routing System ("MFR System").  The MFR System provided Brean Murray with a direct link to Bear Stearns' clearing platform through which Brean Murray could make automated market timing trades at will.

138.    Bear Stearns also provided its network of brokers with access to the MFR System so that they could engage in late trading.  For instance, Bear Stearns permitted its affiliated brokers at Brean Murray to enter trades as late as 5:30 p.m. ET, but at the NAV set as of 4:00 p.m. ET.  Furthermore, Bear Stearns permitted its brokers to employ deceptive strategies to avoid detection from regulators.  For example, the time stamp function on the MFR System was disabled so that there was no record of the when the late trades were placed.

139.    Similarly, senior managers at Bear Stearns assured market timers that it permitted illegal late trading over its platform.  For example, according to Timing Witness #1, in 2000, a representative of Canary met with a Bear Stearns broker-dealer, Kaplan & Co., who had direct access to Bear Stearns' clearing platform, and expressly approved Canary's use of Bear Stearns' trading platform for its illegal trading activity.  Additionally, Bear Stearns provided financing to certain market timers to further facilitate their illegal late trading, including Trout Trading Management Co. ("Trout"), a hedge fund engaged in market timing and late trading.

140.    In addition, during the Class Period, Matt Mills ("Mills"), a Bear Stearns-affiliated broker, negotiated capacity of $80 million in four of the MFS Funds.  According to handwritten notes of an MFS employee, Mills made a pitch to MFS for more capacity, totaling $150-$200 million by year-end.  Shortly thereafter, Mills informed MFS that he was "set to do $50MM," but would often make requests totaling hundreds of millions of dollars in additional capacity.

141.    Bear Stearns profited from its participation in the wrongful conduct through the receipt of commissions and fees generated from timers trading over the firm's platform.  Bear Stearns also profited from the various other arrangements extended to timers, including financing of the wrongful conduct.

142.    Moreover, both Bear Stearns and the MFS defendants knew that their market timing and late trading activity was harming long-term investors.  For instance, as detailed above, MFS tracked market timing by defendants Goldberg and Grady that Bear Stearns facilitated through the use of its platform.  Nevertheless, the market timing and late trading continued because the impact on long-term investors was overshadowed at all times by the defendants' profit motive.  In particular, the MFS defendants viewed Bear Stearns' market

timing assets as essential for maintaining its competitive position among its peers. In fact, the MFS defendants were most concerned that the assets that cleared over the Bear Stearns platform continued to be used for trading within the MFS Funds. In April 2003, for instance, Martin Beaulieu, MFS Executive Vice President, raised his concern about Bear Stearns' trading after receiving a report that indicated that it had engaged in $22.9 million in market timing trades in a single day. His concern, however, was not that the trading was hurting investors, but whether the trading resulted in an outflow of funds to other mutual fund families, thereby preventing MFS from collecting fees on these timing assets:

> [n]ot to be a noodge on this, and I know a number of people are working on this, but those purchases from Bear Stearns seem like timer money? *I hope, in general, timer money is not impacting share*."

(emphasis added)

143.    Beaulieu's question was met with a quick response from Michael J. Londergan, an MFS employee, who explained that timing assets were leaving the funds, but that he along with Fitzgerald would look further into the impact of the Bear Stearns' market timing:

> On the Bear Stearns business since they are moving in and out of the MFS complex the timing is impacting market share. Market share is also impacted by those relationships that process exchanges between MFS funds as redemptions and purchases.

> I am meeting with Jim, Larry and Tom tomorrow to discuss timers and commissions.

144.    The MFS defendants continued to permit Bear Stearns to facilitate the timing and late trading in the MFS Funds.

145.    Moreover, throughout this time, the MFS defendants and Bear Stearns maintained an open dialogue to further their trading scheme and ensure that the trading was within the negotiated parameters. For instance, in July 2003 MFS contacted Bear Stearns to inform it that the market timing policy had been revised pursuant to Fitzgerald's direction. Specifically, MFS

sent Bill Steinberg ("Steinberg") from the home office of Bear Stearns a letter confirming that then-current market timing assets that Bear Stearns permitted to be traded over its platform could continue to be timed, but that new timing assets would not be accepted. On numerous occasions during the Class Period, Ellen Bradley ("Bradley") of MFS contacted Bear Stearns to inform it that its trading may violate the agreed upon terms. For instance, on July 29, 2003, Bradley emailed Evelyn Cardenas ("Cardenas") of Bear Stearns regarding a number of trades in the MFS Government Mortgage Fund. In this email, Bradley directed Bear Stearns to simply use different MFS Funds for market timing, writing that "in the future, we ask that the rep use the MFS Money Market Fund or MFS Government Securities Fund as an alternative for his timing program. . . ."

ii.    Bank of America

146.    Like Bear Stearns, Bank of America and its affiliates provided various timers, including Canary, with an electronic trading system that facilitated the market timing and late trading scheme. Beginning in 2001, Bank of America: (1) installed a state-of-the-art electronic late trading platform at various timers, including Canary, allowing them to trade as late as 8:30 p.m. ET in the hundreds of mutual funds that the bank offered its customers at the 4:00 p.m. ET NAV; (2) provided Canary with approximately $300 million of credit to finance its late-trading and market timing activity in the hundreds of mutual funds that Bank of America could access by virtue of its size and power; and (3) sold Canary the derivative short positions it needed to time the funds as the market dropped. As a result, Canary became one of Bank of America's largest customers.

147.    Bank of America profited greatly from the fees generated by market timing, including millions of dollars in "finder's fees" from MFS. According to Timing Witness #1, these so-called finder's fees were equal to as much as 100 basis points (1%) of a timer's assets

under management. All of this activity was coordinated through the Bank of America broker who brought Canary in as a client, defendant Theodore C. Sihpol, III ("Sihpol").

148. In addition, Bank of America facilitated illegal trading by providing brokers with access to its trading platform, including defendants Grady and Goldberg. In fact, Bank of America transacted one of the largest amounts of market-timing capacity in the MFS Funds, totaling as high as $322 million in market timing capacity during the Class Period.

149. Moreover, the Bank of America defendants were intimately involved in arranging and controlling capacity traded on their platform. This capacity was marketed by a number of in-house Bank of America broker-dealers, including defendant Sihpol, who at times was responsible for as much as at least $48 million in MFS timing capacity.

iii.   Prudential

150. Throughout the Class Period, defendant Prudential Securities was one of the largest market timing broker-dealers in the MFS funds. The Prudential Defendants executed market timing and late trading transactions on behalf of their own investors, using their own platform. Moreover, as documents and sworn testimony revealed, the MFS defendants were fully aware of the Prudential Defendants' unlawful market timing activities. As a result of the Prudential Defendants' market timing at MFS, as well as dozens of other mutual fund firms, in November 2003, the SEC and the Massachusetts Secretary of the Commonwealth each brought charges of securities fraud against the Prudential Defendants.

151. In particular, since 1998, the Prudential Defendants engaged in massive amounts of market timing of the MFS Funds and other fund families through a well-orchestrated and managed organization. In carrying out their trading scheme, the Prudential Defendants functioned as both the introducing and platform broker for their timing clients. The market timing was initially approved by Prudential's senior managers, including Prudential's President,

51

Jamie Price, and Prudential Securities' President, Michael Rice.    Specifically, the Prudential

Defendants required timers to send "inactive" orders between 6:30 a.m. ET and 9:00 a.m. ET

each day.    However, these orders were not placed, or made "active," until the Prudential

Defendants received further instructions to transact all or part of the orders from the timers.

152.    Further, many of these orders were not place until after 4:00 p.m. ET, to facilitate

late trading.  To engage in this late trading, the Prudential Defendants required the cooperation of

Prudential's New York office because, after 4:00 p.m., that office was the only location that

could execute trades.    Accordingly, over the course of the Class Period, the Prudential

Defendants sent thousands of late trades by fax to the New York office after 4:00 p.m. ET for

processing.  In fact, between January 30, 2001 and August 23, 2003, Prudential's New York-

based mutual fund exchange desk entered at least 1,212 mutual fund transactions after 4:00 p.m.

on behalf of the Druffner Group, alone representing $162,444,725 in trades.    At no time,

however, did anyone at Prudential ever question this huge volume of trades or confirm whether

these orders were made before 4:00 p.m. ET.

153.    Although this market timing violated Prudential's own internal policies, the firm

expended considerable resources to further the operation rather than prevent the illegal conduct.

Indeed, in 1999, Prudential established an anti-market timing policy in its own mutual funds,

which it prohibited trading in excess of once per quarter or more than four times per year.

Nevertheless, throughout this period, Prudential knowingly facilitated the Prudential Defendants'

market timing in the MFS Funds and other fund complexes.

154.    Nor did the transfer of Prudential Securities to Wachovia Securities have an

impact on its facilitation of market timing and late trading.  Specifically, in August 2003,

defendant Druffner met with Prudential Securities' President Michael Rice ("Rice") while

attending a due diligence meeting at Wachovia's headquarters in Richmond, Virginia.  During this meeting, Rice assured Druffner that "everything was going fine, just keep your head down and wait until the deal closes."  Rice further explained that "there is other timing going on at Wachovia and that there should be business, same old business."

155.    Additionally, Prudential channeled significant resources to the Druffner Group to further its market timing and late trading in the MFS Funds, as well as numerous other Fund complexes.  For example, defendant Shannon instructed the "Wire Room," which transmitted the daily orders, to give the Druffner Group absolute priority over all other groups between 3:00 p.m. and 4:00 p.m. ET each day.  This extra attention to the market timing trades often resulted in legitimate customers' trades missing the market-close deadline.  Additionally, the Druffner Group received extra staffing when other groups in the office were told that budget constraints would not allow for extra help.  In at least one instance, staff was taken away from the other groups in order to have extra support for the market timing and late trading.  Similarly, the Druffner Group received extra equipment, like fax machines, to process the late trades.  In fact, defendant Vanin gave the Druffner Group his own "branch manager fax machine" located in the administrative manager's office to receive late day orders from clients.

156.    The Prudential Defendants' market timing and late trading was further facilitated by the MFS defendants.  As documents and testimony revealed, the MFS defendants knew of the Prudential Defendants market timing and late trading, advised them as to which funds they could time, and monitored their trading.

157.    In fact, in an April 20, 2000 letter to defendant Druffner, MFS employee Ellen Bradley explained that she had been monitoring the Prudential Defendants' trading and that she

wanted to clarify the market timing arrangements, and listed which MFS funds the Prudential Defendants could freely time. This list included all of the Unrestricted Funds.

158.    Both the Prudential Defendants and MFS understood the extent to which their market timing and late trading activities harmed MFS investors. For example, in the Summer 2003, the Prudential Defendants' trading caused major disruption to the MFS Small Mid Cap Growth Fund, which was immediately detected by MFS insiders who monitored the market timing activities. In an August 26, 2002 email entitled "CASH FLOW ALERT – SPME," Tucker Jones of MFS wrote:

> I put $3.3M to work on Friday, how can we possibly run these accounts with close to 20% coming in/out on a daily basis? I'd love some suggestions on how we can be proactive on this because it's happening way too much lately. Thanks.

159.    Another MFS employee, Michael Keenan, forwarded Jones's message to Joanne McCormick of Prudential Securities. In turn, McCormick replied that Prudential Securities senior management knew about the disruptive effects of this market timing:

> As we discussed on the phone, Prudential understands that this frequent trading activity has been disruptive to the fund and we are doing everything in our power to clamp down on it. Senior management is well aware of this problem and we are in the midst of gaining approval on a new, stricter market timing policy.

Again, however, as detailed above, despite admitting that their conduct harmed the MFS Funds' investors, the Prudential Defendants continued to engage in and facilitate illegal trading in the MFS Funds.

160.    The scheme continued because it was profitable for all involved. For instance, with support from both MFS and Prudential, the Druffner and Peffer Groups profited handsomely from the illegal trading. In fact, the trading was so profitable that the Druffner Group was repeatedly the highest performing broker group in Prudential Securities' Boston office and among the highest nationwide. To motivate other brokers in the Boston office,

defendant Vanin would post a banner each week to boast of the Druffner Group's "success." Furthermore, the MFS defendants profited from the Prudential Defendants' assets placed under management, while knowing that long-term investors were being injured.

iv.    Charles Schwab

161.    Like Prudential, Schwab knowingly facilitated market timers' trades in MFS Funds through the use of its mutual fund "supermarket" clearing platform. Schwab routinely communicated with the MFS defendants about their market timing activities and knew that the trading they facilitated harmed long-term investors.

162.    Schwab's facilitation of market timing was so egregious that it stood out among its peers. In fact, according to MFS internal documents, market timing through the Schwab mutual fund supermarket platform far exceeded other platforms. This was the direct result of Schwab permitting brokers and known market timers to open accounts and freely trade over its platform.

163.    For instance, Schwab established trading rules that were extremely attractive to timers. Unlike other clearing brokers, Schwab did not require a three-day settlement period for cash received in mutual fund trades. This policy resulted in market timers having their cash available almost immediately for the next round of trading. Additionally, Schwab facilitated timing activity by protecting timers' identities. For instance, timers knew that their identity would not be disclosed to fund firms if their individual trades were each under $500,000, although the total value of their trades exceeded that amount.

164.    The MFS defendants admitted to knowing Schwab's practices and recognized that the Schwab Defendants served as "buffer" between MFS and the timing broker, but permitted the illegal trading to continue regardless. Additionally, during the Class Period, Schwab and the MFS defendants knew that the illegal trading that Schwab permitted to be transacted over its

55

platform was damaging long-term investors. In fact, the two sides had numerous correspondence and telephone conferences regarding the damage being done to investors. However, the illegal trading of the MFS Funds continued via Schwab's platform.

165.    Furthermore, Schwab, unlike any other platform broker, provided timers with margin loans on new fund share purchase without waiting the customary 30 days before such loans were granted. Accordingly, timers in the Schwab supermarket had quick access to both cash and financing making it an attractive place to time mutual funds.

v.    Security Trust Company

166.    Security Trust Company also facilitated market timing and late trading in numerous mutual fund complexes, including MFS. Security Trust Company was originally established in 1991 by defendant Seeger as Security Investment Management & Trust to engage in securities sales to private custodial accounts. In 1998, however, Security Trust Company's business shifted to serving as a custodian for retirement plans and their third party administrators ("TPAs"). Ultimately, Security Trust Company developed an electronic trading platform that allowed retirement plan participants to trade mutual funds in a single day. The platform relied upon Security Trust Company's access to an interface sponsored by the NSCC that enabled simultaneous trading in thousands of mutual funds through an NSCC subsidiary corporation known as Contribution Clearance & Settlement.

167.    Security Trust Company's trade processing involved several steps. First, retirement plan sponsors collected orders for the purchase and sale of mutual fund shares from plan participants during the day and then "shut off" the participants' ability to enter trading orders at 4:00 p.m. ET. Thereafter, by approximately 6:30 p.m. ET, Security Trust Company provided to its TPA clients a filing showing that day's NAV for all mutual funds that can be traded through its platform, including MFS Funds. The TPAs then created a trade file listing the

56

trades for all plan participants and delivered this file electronically to Security Trust Company by approximately 9:00 p.m. ET. Security Trust Company processed these files through internal, proprietary databases and sent them electronically to NSCC in a single, consolidated file. NSCC then executed and settled the trades with the various mutual funds, and provides confirmations to Security Trust Company that are forwarded to the TPAs.

168.    In April 2000, representatives of Canary contacted Seeger regarding Security Trust Company's ability to provide market timing capacity and late trading in various mutual funds, including the MFS Funds. During these discussions, Canary's representatives learned that because of Security Trust Company's trade processing procedures for TPAs, they could submit trades through Security Trust Company as late as 9:00 p.m. ET and still receive that day's NAV for the mutual funds.

169.    In May 2000, Canary opened up several accounts at Security Trust Company to test its ability to trade through Security Trust Company's platform. After confirming its ability to trade through Security Trust Company's platform, from May 31, 2000 to July 10, 2003, Canary effected mutual fund trades at Security Trust Company in 397 mutual funds, including the MFS Funds, through 22 master accounts and 136 sub-accounts. Almost 99% of these trades were transmitted through Security Trust Company after 4:00 p.m. ET; and almost 82% were sent to Security Trust Company between 6:00 p.m. and 9:00 p.m. ET. To make the accounting of these trades easier, Security Trust Company set Canary up with an electronic trading system called "Advent," which made the accounting much easier than having manual blotters for the trades.

170.    Moreover, throughout the Class Period, the MFS defendants knew that Security Trust was engaged in market timing activities because the two firms had an open dialogue

regarding the trading.  For instance, handwritten notes of an MFS employee state that "Security Trust of AZ wants to move NAV purchases in unrestricted funds for timing purposes – wherever we're comfortable."    Additionally, MFS insiders had numerous phone conversations with Security Trust regarding the market timing activity.  For instance, on February 3 and 4, 2003, Amy Rocco of MFS's trust department memorialized two telephone calls with Tom Healy and Jay Marran of Security Trust indicating that the calls were "regarding the timing."  Furthermore, MFS insiders apparently assisted Security Trust in clearing market timing trades through the NSCC platform.  Specifically, MFS's records reveal that on February 6, 2003, Amy Rocco spoke with Stephanie Holloway of Security Trust regarding "client service rep on the account where there were isues [sic] with timing was able to do an exchange through the nscc successfully."

vi.    <u>J.B. Oxford</u>

171.    From at least June 2002 until September 2003, defendant JB Oxford & Company, through its subsidiary, NCC, facilitated over 12,000 late trades by select customers in more than 74 mutual fund families and over 600 mutual funds, including, upon information and belief, MFS mutual funds.  Through its participation in the late trading and market timing schemes, defendant NCC realized almost $1 million in proceeds from compensation agreements with its customers who reaped at least $8 million in profits at the expense of ordinary, long-term shareholders.

172.    Defendants Lewis and Lin negotiated the agreements by which NCC enabled its customers to engage in late trading activities.  Defendant Kibble transmitted and approved transmittal of late trades to the mutual funds.  Specifically, in May 2002, Lewis began negotiating NCC's first arrangement with a customer for late trading activities.  During the meeting, the customer expressed an interest in late trading, explaining that it was permitted to submit trades to one clearing firm until 7:00 p.m. ET.  Following the meeting, Lewis directed

58

Kibble to research NCC's cut-off time for mutual fund order entry. Following Kibble's report to Lewis that NCC could submit trades until 6:50 p.m. ET, Lewis responded in an email, "this is great news! I will tell them we need preliminary [orders] during the day and final orders by 6:30 pm EST; and no fee on no load; and we will continue working on getting a later time entry on orders. I will tell them we want $25 MM to start and would like to do more once we show them the great CX we are going to deliver!"

173. NCC entered into an agreement with this customer, called a mutual fund procedural agreement, that was used as the template for each successive agreement that NCC entered into with future customers. Specifically, the contract provided that: "Each day that Customer intends to engage in mutual fund transactions, Customer shall send via Excel spreadsheet or other mutually acceptable means to JB Oxford a list of proposed transactions before 4:15 p.m. New York time . . . Customer intends to confirm and activate such trade communications via telephone by 4:45 p.m., New York time, which shall be deemed made upon oral or written verification." Defendant Lewis signed the first such agreement on behalf of NCC on May 30, 2002.

174. Each subsequent agreement entered into by NCC with its customers was virtually identical to the first agreement negotiated and signed by defendant Lewis. The first agreement required the customer to pay NCC 90 basis points (.9%) of assets under management for the right to engage in late trading. Subsequent customers paid 100 basis points (1%) for the ability to late trade. Defendant Lin negotiated additional late trading arrangements with at least four of NCC's customers. As of September 25, 2002, Lin had opened accounts through which late trading was to occur worth over $40 million.

175.    Moreover, through email communications on August 2, 2003 and August 8, 2003, defendant Lewis approved overtime for personnel that was necessary to enter late trades. Thereafter, on September 3, 2003, in response to a suggestion by an employee that the customers submit their trades earlier in the day, Lewis sent an email to Kibble stating, ". . . as a matter of practice, we discussed a 5 pm PACIFIC cut-off for trades, if we want to keep this business, we need to give our clients as much opportunity as possible to make money. We have a strategic advantage in our west coast location; we should not be trying to match NY, but being better on the westcoast [sic].  We have a great opportunity here and I would like a better explanation of why we can't deliver."

4.    The Financier Defendants'
Participation In The Wrongful Conduct

176.    During the Class Period, market timing and/or late trading constituted a niche-business catered to by investment banks, including defendants JPM, CIBC, Bank of America, Bear Stearns, and CSFB.  The investment banking defendants provided market timers and/or late traders with financing specifically designed for this purpose.

177.    In some cases, the  mutual fund family permitting the market timing and/or late trading arranged the financing by the investment banks for the market timers and/or late traders. In other cases, the market timers and/or late traders approached the investment banks for financing.  Market timers and/or late traders openly discussed with the investment banks the purpose of the loans – to market time and/or late trade mutual funds – and often disclosed such purpose expressly in the financing documents.  Loan agreements regularly specified collateral – sometimes fund concentration and market exposure – demonstrating that the investment banks knew they were providing financing to market timers and/or late traders.   Many financing

agreements even required the timers to provide the Financier Defendants with daily reports on their collateral and trading activity and/or open access to such records.

178.    Among the market timing financing tools offered by the Financier Defendants were "equity swaps," whereby market timers/late traders were actually allowed to manage accounts in the name of a Financier Defendant pursuant to a written management agreement. The steps taken in a swap agreement were as follows:  (i) the bank and the market timer/late trader would enter into a management agreement outlining the market timing and/or late trading, and overall investment objectives; (ii) the bank would open an account and the market timer/late trader would create a subsidiary that was made the manager of the account; (iii) the bank would have a subsidiary, often in London, perform the "swap" with the market timer/late trader; and (iv) the market timer/late trader would pay LIBOR +125-200 basis points to the bank subsidiary, which would pay the market timer/late trader the return on a reference index.  For every $1 in collateral provided by the market timer/late trader, the bank would extend up $10 for trading.

D.    Harm To MFS Funds Investors

179.    Market timing caused significant harm to ordinary long-term MFS mutual fund investors in a variety of ways.  For example, market timing caused "dilution," by not only depriving non-timer MFS mutual fund investors of gains they would otherwise realize on their investments, but also by forcing them to incur a disproportionate share of the losses on days that the NAV declines.   The timer steps in at the last minute and takes part of the buy-and-hold investors' upside when the market goes up; and as a result the next day's NAV, as calculated on a per share basis, is less than it would have been had the timer not invested in the fund. Conversely, if the timer sells shares on days that market prices are falling below the calculated NAV, the arbitrage has the effect of making the next day's NAV, as calculated on a per share

basis, lower than it would otherwise have been thus magnifying the losses experienced by other investors in the fund.

180.     The harm to MFS mutual fund investors from market timing extends beyond dilution.  For example, as detailed above, successful market timing requires repeated, rapid trading of MFS shares with significant amounts of cash which, in turn, dramatically increases transaction costs, such as commissions, on the long-term investors that eat away at returns. Trades necessitated by market timer redemptions can also lead to realization of taxable capital gains, or may result in managers having to sell stock into a falling market which impose costs on the fund's long-term investors.

181.     Market timing at MFS also harmed mutual fund investors by forcing portfolio managers to invest heavily in highly liquid, short-term investments that carry a lower rate of return than other securities, to ensure their ability to redeem shares sold by market timers.  Fund managers were therefore forced to enter into special investments as an attempt to "hedge" against timing activity (instead of simply refusing to allow it), thus deviating altogether from the ostensible, publicly stated investment strategy of their funds, and incurring further transaction costs while at the same time leading to decreased investment performance and additional expenses.

182.     Experts estimate that mutual fund investors, including MFS shareholders, have lost billions of dollars annually as a result of market timing.  Indeed, one recent study estimated that U.S. mutual funds lose $4-$5 billion per year to timers.  Eric Zitzewitz, Who Cares About Shareholders?  Arbitrage-Proofing  Mutual  Funds  (October  2002)  35,  http://faculty-gsb.stanford.edu/zitzewitz/Research/arbitrage1002.pdf.     University  of  South  Carolina  law

professor John Freeman has similarly estimated that market timing trades may have drained more than $5 billion a year from long-term fund shareholders.

183.    The MFS defendants knew throughout the Class Period that the market timing and late trading in the MFS Funds caused significant damage to its innocent long-term investors. As detailed below, the MFS defendants knew that "timers, no matter what their strategy, can cause unnecessary trouble to an asset management company."  In fact, MFS's public disclosures purported to prohibit market timing, and MFS claimed to police against timing, precisely because of its harmful effects.  Furthermore, investigations have uncovered numerous instances in which senior MFS officials were advised that market timers were injuring investors.  Each time, the MFS defendants ignored the warnings, and instead permitted the trading to continue.

184.    For example, in June 2002, the MFS Emerging Growth Fund was the subject of an "overdraft" caused by timers pulling out too much money too quickly.  The overdraft rendered the fund unable to meet its obligations and required it to draw on a line of credit. Defendant Ballen was warned of this disruption, which harmed the fund by having to pay interest on the credit line.  Nevertheless, defendant Ballen permitted market timing to continue in that fund until as late as October 2003.

185.    Similarly, in April 2003, the Massachusetts Investor Trust Fund was forced to draw on its credit line due to market timers' redemptions.  This extraordinary measure was necessary for the fund to meet its obligations; however, long-term investors in the fund were forced to pay the cost of financing the consequences of the market timers' overdraft.  On April 17, 2003, before the overdraft occurred, defendant Parke was notified of the large swings in the funds cash flows.  Parke did not, however, stop the timing activity.

186.    Similarly, in October 2002, MFS's Chief Administrative Officer informed defendant Parke that the MFS Research Fund was being adversely affected by market timing. Specifically, the officer asked that timing no longer be permitted because it was becoming too disruptive to the fund's investment strategy. Despite these warnings, however, MFS, including defendant Parke, allowed timing to continue in the Research Fund during the Class Period.

187.    Further, in July 2003, defendant Parke acknowledged the harm caused by market timers, but failed to act. In an internal email to a top-level executive at an MFS subsidiary, Parke wrote: "[t]imers in the Government Mortgage Fund have become an increasingly large problem. The size and frequency has increased. This is adding complexity to the portfolio management process. Can we take this fund off the timer list?" Despite his acknowledgment of the problem, Parke, and other MFS executives, permitted timing in that fund to continue during the Class Period.

188.    Also, in July 2003, defendant Ballen admitted the harm caused by market timers. In an email on July 3, 2003, Ballen stated that market timing is "very disruptive in lots of places to the organization and in some cases can harm the performance of the funds due to higher trading costs as the funds buy and sell due to cash changes." In that same email, Ballen acknowledged that market timing was increasing, but he failed to take remedial measures during the Class Period.

E.    The Failure Of The Trustee Defendants

189.    ICA requires individual mutual funds to be governed by a Board of Trustees (the "Board"), and further requires, in most cases, that as many as 40% of the members of the Board be independent from and unaffiliated with the investment adviser or its parents, subsidiaries or affiliates. The purpose of this independence requirement is to ensure that the management of the mutual funds is not dominated by the Fund Sponsor/Investment Adviser and that, instead, the

fund is managed in the best interests of its shareholders.  This responsibility not only includes

retaining and monitoring the performance of the Investment Adviser and Administrator, but

negotiating contracts with these parties and ensuring that the fees paid are reasonable in relation

to the services performed.  Indeed, the Investment Company Institute ("ICI"), recently described

the duties of mutual fund boards:

> Unlike the directors of other corporations, mutual fund directors are
> responsible for protecting consumers, in this case, the funds' investors.  The
> unique "watchdog" role, which does not exist in any other type of company in
> America, provides investors with the confidence of knowing the directors oversee
> the advisors who manage and service their investments.
>
> In particular, under the Investment Company Act of 1940, the board of
> directors of a mutual fund is charged with looking after how the mutual fund
> operates and overseeing matters where the interests of the fund and its
> shareholders differ from the interests of its investment advisor or management
> company.

190.    Further, Section 15(c) of the ICA provides:

> It [is] the duty of the directors of a registered investment company to
> request and evaluate, and the duty of an investment adviser to such company to
> furnish, such information as may reasonably be necessary to evaluate the terms of
> any contract whereby a person undertakes regularly to serve or act as investment
> adviser of such company.

191.    Notably, Ballen and Parke filled dual roles subject to the obligations of ICA

§15(c), having acted both as a Trustee of the MFS funds and an officer of MFS, the investment

adviser to the MFS Funds.  Accordingly, Ballen and Parke were specifically obligated to disclose

the market timing and late trading activity at MFS to the Outside Directors, and the Outside

Directors were likewise obligated to request such relevant information.  Ballen and Parke,

however, did not request and/or disclose the relevant information, in violation of the provisions

of 15(c) of the ICA.

192.    In reality, the Boards of the MFS Funds were dominated throughout the Class

Period by MFS and its affiliates, who not only, as a practical matter, controlled the nomination

and appointment process, but also the fees that the purportedly independent trustees earned from serving on the fund boards. Indeed, the Boards of the individual MFS funds did not even accept nominations from shareholders for membership until near the end of the Class Period. Further, the purportedly "independent" trustees, who fulfilled this role in addition to their full-time occupations, served on multiple MFS fund boards, rendering it difficult to oversee the activities of the funds consistent with their fiduciary duties. These trustees were well-compensated for their service. Although these fees were purportedly set by the compensation committee of the board of each individual MFS fund, the compensation levels were actually usually based upon the recommendations of MFS. The fees themselves, however, were paid from deposits within the funds themselves.

193.    Throughout the Class Period, the Trustee Defendants failed to adequately protect the interests of the MFS Funds shareholders, to whom they owed duties of care and loyalty. As detailed herein, each of the Trustee Defendants failed to fulfill his or her duties as a director and/or trustee of the MFS Funds by failing to protect the interests of the MFS Funds shareholders by neglecting the market timing and late trading activities that were being marketed, negotiated and permitted by MFS, all to the detriment of the shareholders the trustees were entrusted to protect. Rather, the trustees favored their own interests, in return for compensation received by MFS without adequate consideration of the interests of the MFS Funds investors. The Director and Trustee Defendants also failed to fulfill their duties by neglecting to detect and stop the illicit trading activities that pervaded the MFS Funds throughout the Class Period.

194.    In fact, the Trustee Defendants stood to gain financially from deferring to MFS and the MFS defendants. First, they benefited from their commitment and relationship with MFS by serving on multiple boards of various MFS Registrants and MFS Funds. For example,

as reported in *The Wall Street Journal* on March 17, 2004, Lawrence Cohn, the chief of cardiac surgery at Brigham & Women's Hospital in Boston, serves as an independent trustee for all of the MFS Funds. Moreover, the Trustee Defendants earned as much as $115,000 in direct compensation for serving on the board of various MFS Funds.

      F.      Defendants' Profits From The Unlawful Conduct

          1.      12b-1 Fees

195.    In 1980, the SEC promulgated Rule 12b-1 under the ICA, which permits an open-end mutual fund to pay expenses in connection with the distribution of its shares, "provided that any payments made by such company . . . are made pursuant to a written plan describing all material aspects of the proposed financing of distribution and that all agreements with any person relating to implementation of the plan are in writing . . ." Rule 12b-1 further requires such a plan to be approved by a majority of the fund shares, as well as a majority of the "independent" directors of the fund. The written plan must include not only the total dollar amount and percentage of average net assets under management used for distribution expenses, but also the manner in which such amount was spent on the following areas: (i) advertising; (ii) printing and mailing of prospectuses; (iii) compensation to underwriters; (iv) compensation to dealers; (v) compensation to sales personnel; and (vi) others uses for which funds were spent. As set forth in its release adopting Rule 12b-1, the SEC reasoned that mutual fund investors would benefit from the use of their funds to expand distribution, since such expenditures would encourage growth in the assets under management which, in turn, would foster economies of scale and ultimately reduce the expenses borne by individual investors.

196.    Throughout the Class Period, the Director Defendants authorized, and MFS charged and collected, millions of dollars in Rule 12b-1 marketing and distribution fees. In fact, in furtherance of the market timing and late trading scheme detailed above, MFS charged and

collected 12b-1 fees at an annual rate of 35 basis points (0.35%) of a fund's average daily net assets and were computed on a daily basis and paid monthly.

197.     As a direct result of the market timing and late trading activity detailed herein, the percentage of average annual assets under management was significantly increased by the influx of the timing assets into the MFS Funds. In fact, during the Class Period, as much as $2 billion in timing assets were invested throughout the MFS Funds, at any one time, resulting in a substantial increase in the percentage of average annual assets under management. The Director Defendants and MFS did not, however, reduce the 12b-1 fees. Rather, the Director Defendants continued to authorize, and MFS continued to charge and collect, the same, or a greater, percentage of 12b-1 fees.

198.     By facilitating the market timing and late trading activities alleged herein, MFS was able to profit substantially from the receipt of increased 12b-1 fees, based upon the inclusion of the market timing cash infusions into the calculation of assets under management. In particular, from 1998 to 2003, MFS was among the top 4 mutual fund families in 12b-1 revenues, earning between $300 million and $585 million annually in revenues from 12b-1 fees charged to its "long-term" category of mutual funds alone. Similarly, between 1998 and 2003, MFS earned between $246 million and $528 million annually in revenues from 12b-1 fees charged to its "equity" category of mutual funds. Moreover, in comparison to its wholesale distribution peers in the "equity" category of funds, during the Class Period, every year from 1998 through 2003, MFS charged between 54 (.54%) up to 91 (.91%) basis points in 12b-1 fees. With these rates, MFS consistently ranked among the top tem highest charging firms among its peers.

2.    <u>Advisory and Management Fees</u>

199.    Throughout the Class Period, the Director Defendants authorized, and MFS charged and collected, hundreds of millions of dollars in fees for the advisory services provided by MFS to the MFS Funds.  The MFS Prospectuses uniformly disclosed that the advisory fees and management fees were charged as a percentage of average annual net assets under management.  Specifically, the actual advisory fees charged at an annual rate varied. For instance, the rates charged to the Timed Funds ranged from 33 to 75 basis points (.33% to .75%) of the funds' average daily net assets.  The fees were computed and paid monthly.

200.    As detailed above, the influx of the illegal market timing and late-trading assets increased the average annual assets under management, thereby increasing the fees authorized by the Director Defendants and charged and collected by MFS.  The services provided by MFS on the timing and late-trading assets did not, however, justify the payment of advisory fees on those timing assets.  In fact, as further incentive to MFS, the fees collected as a result of the increased assets under management, were collected without any additional advisory services being provided.  Moreover, during the Class Period, the asset-weighted total fees (calculated by weighing the total fees charged per fund within the MFS fund complex in correlation to the total assets within each fund) charged, and collected, by MFS in relation to its peer group of wholesale distribution mutual fund families remained among the highest throughout the Class Period.

201.    By facilitating the market timing and late trading activities alleged herein, MFS was able to profit substantially from the receipt of increased fees, based upon the inclusion of the cash infusions from the illegal trading into the calculation of assets under management. Additionally, the fees charged by MFS and paid by the MFS Funds investors in the "long-term" category of the MFS Funds ranged from 126 (1.26%) to 132 (1.32%) basis points from 1998 to

2003.  Likewise, the fees charged by MFS and paid by the MFS Funds investors in the "equity" category of the MFS Funds were 127 (1.27%) basis points in 1998 and increased to 135 (1.35%) basis points in 2003.   As a result of these fees, MFS consistently ranked as one of the most expensive funds families.  These fees were computed and paid on a monthly basis.  In sum, MFS charged investors in its "long-term" category of funds in excess of $5.8 billion in total fees from 1998 to 2003.

202.    In particular, from 1998 to 2003, MFS's revenue from fees ranged between $678 million and $1.27 billion annually from fees charged to its "long-term" category of mutual funds alone.   Moreover, in comparison to its wholesale distribution peers within the mutual fund industry during the Class Period, MFS ranked among the most expensive funds in both the "equity" and "long-term" categories.

203.    As detailed above, by facilitating the market timing and late trading activities alleged herein, MFS profited substantially from the receipt of increased management fees, based upon the inclusion of the cash infusions from the timing assets into the calculation of assets under management.

3.    Directed Brokerage And Shelf
Space Payments To Broker Dealers

204.    Because MFS earned higher fees as a result of market timers' contribution of assets under management, MFS had the financial resources to pay broker-dealers for preferential treatment in marketing the funds to ordinary investors.  In turn, the investors that the broker-dealers steered to the MFS Funds as a result of MFS's payments to broker-dealers further increased MFS's assets under management.  Simply put, by opening its doors to billions of dollars in market timers' money that boosted assets under management, the MFS defendants had more money to pay broker-dealers for marketing, distribution, and shelf space arrangements.

These payments also furthered MFS's relationship with broker-dealers and were in addition to the 12b-1 fees, distribution fees, various sales charges and commissions, dealer concessions, shareholder servicing payments, and payments for services that MFS also paid to these broker-dealers.

205.    Specifically, from January 2000 to November 2003, the MFS defendants entered into written and oral agreements to make payments to over 100 broker dealers, including defendants Salomon Smith Barney and Morgan Stanley Dean Witter, in exchange for the brokers promoting the MFS funds to their clients.  In turn, the brokers steered their clients, including the market timers, into the MFS Funds because they were receiving these payments, and not necessarily because the investments were in their client's best interest.  These arrangements resulted in additional assets being deposited in the MFS Funds and higher fees being paid to MFS.  Ultimately, the additional assets under management contributed by the market timing and late trading made these payments possible.  These express agreements between MFS and the broker-dealers, known at MFS as "Strategic Alliances," violated the securities laws, the defendants' fiduciary duties, and MFS's stated policies.  MFS's Strategic Alliances were the flipside of unlawful arrangements such as Smith Barney's Strategic Partners Program described in detail above.  On March 31, 2004, the SEC filed a cease and desist order against MFS ordering it to cease from continuing these illegal practices.

206.    For example, the MFS defendants used the additional assets under management contributed by the market timers to pay commissions to the broker-dealers in excess of the cost of trade execution alone.  The portion of the commissions in excess of the cost of trade execution is known as "soft dollars."  For example, MFS could have executed trades at $0.03 per share.

Instead, MFS chose to pay its Strategic Alliance partners $0.05 per share, with the additional $0.02 per share (i.e., the soft dollars) used as a payoff to the broker-dealers for shelf space.

207.    While soft dollar payments are permitted in limited circumstances, MFS's payments were improper.  Specifically, a mutual fund may use soft dollars to pay only for "brokerage and research services" that are services in addition to trade execution.  This practice is permitted under Section 28(e) of the Exchange Act, which provides that a mutual fund investment advisor may cause the mutual fund to:

> pay a member of an exchange, broker, or dealer an amount of commission for effecting a securities transaction in excess of the amount of commission another member of an exchange, broker, or dealer would have charged for effecting that transaction, *if such person determined in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such member*, broker, or dealer, viewed in terms of either that particular transaction or [the adviser's] overall responsibilities with respect to the accounts. . . .

15 U.S.C. § 28(e) (2004) (emphasis added).

208.    These payments can not be made as a pay off for shelf space, as was the case at MFS.  Specifically, MFS gained from the improper use of soft dollars in at least two ways.  First, the broker dealer would  give MFS's Funds prominence over other fund complexes, or shelf space, among the broker-dealers' offerings.  Countless investors were steered by these broker-dealers to the MFS funds, resulting in increased assets under management at MFS and higher investment management fees.  Second, the cost of gaining this marketing advantage was free for MFS.  That is, there was an additional benefit to using soft dollars rather than cash, or "hard dollars."  Soft dollars are paid from commissions that come out of the funds' assets (i.e., the investors' assets).  In contrast, if MFD paid for the purported "brokerage and research services" separately, it would have had to pay cash out of its assets, not the funds'.

209.    The use of soft dollars for this purpose furthered MFS's interests, while conflicting with the best interest of investors.  In fact, MFS directed the use of soft dollars in order to reduce MFD's expenses, while causing investors' expenses to rise.  This direction was documented.  In fact, to manage the Strategic Alliances, certain MFS employees drafted guidelines regarding how the arrangements should be negotiated.  The draft guidelines stated that "[i]t is incumbent on [the employee] to negotiate the best deal for MFS.  Usually this means trying to cover as many costs through soft dollars as possible rather than have MFS or MFD payout of their own pockets."

210.    These Strategic Alliance payments would typically range from 15 to 25 basis points (.15% to .25%) paid to the broker-dealer on mutual fund gross sales.  In order to incentivize broker-dealers to advise their clients to maintain their investments in the MFS Funds, MFS also used soft dollars to pay the broker-dealers 3 to 20 basis points (.03% to .20%) on mutual fund assets held by the broker-dealer's clients for over one year.  MFS intended that these payments would lead broker-dealers to advise clients to maintain their holding in the MFS funds despite poor market performance.  Additionally, MFS paid 1.5 times the fee in soft dollars to a broker-dealer that would be paid in hard dollars in order to satisfy the same obligation.  These payments were possible because of the additional assets under management deposited by market timers.

211.    Moreover, MFS's use of the market timers' assets to pay soft dollars for shelf space contradicted its uniformly stated disclosures and violated MFS's written guidelines regarding soft dollars.  Since 1997, MFS has had written guidelines governing the use of soft dollars, which required that at all times the allocation of trades must be consistent with achieving the best execution, not MFS's self interest.  Furthermore, the guidelines required that MFD was

73

prohibited from entering "into any contract, letter agreements or oral agreements with respect to soft dollars and directed brokerage arrangements" or any directed brokerage arrangement that could imply a binding agreement to direct commissions or any "non-binding targets for the direction of portfolio transactions in any way which would state or imply that such targets are binding or are being used to offset [MFD's] legal or contractual obligations."

212.    In violation of these rules, MFS entered into at least two written agreements and many explicit oral agreements to satisfy Strategic Alliance obligations.    Moreover, MFD employees considered Strategic Alliance allocations to be binding obligations, and they would refer to allocations of commissions as "obligations," "commitments," or amounts "due" or "owed."    Also according to the SEC, MFD's obligation to pay brokerage commissions under the Strategic Alliance agreement were so formalized that some broker-dealers would send invoices for payment.

## V.    CLASS ALLEGATIONS

213.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons and entities who purchased and/or held shares in any mutual fund in the MFS fund family adversely affected by market timing and/or late trading that was advised by MFS during the period from December 15, 1998 to December 8, 2003.    Excluded from the Class are defendants, members of their immediate families and their legal representatives, parents, affiliates, heirs, successors or assigns, the family members of the MFS Individual Defendants and any entity in which defendants have or had a controlling interest, and any other person who engaged in the unlawful conduct described herein (the "Excluded Persons").    Also excluded are any officers, directors, or trustees of the Excluded Persons, and all trustees and portfolio managers of the Funds.

74

214.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiff at the present time and can only be ascertained from books and records maintained by MFS and/or its agent(s), Lead Plaintiff believes that Class members number in the hundreds of thousands.

215.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether federal, state and/or common law was violated by defendants' acts and omissions as alleged herein;

b.    whether the registration statements and prospectuses set forth in Appendix B, annexed hereto, contained substantially the same misstatements of material fact or omitted to state substantially the same material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c.    whether defendants breached their fiduciary duties to Lead Plaintiff and the members of the Class; and

d.    whether Lead Plaintiff and the other members of the Class have sustained damages and, if so, the appropriate measure thereof.

216.    Lead Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Lead Plaintiff has retained competent counsel experienced in class and securities litigation and intends to prosecute this action vigorously.  Lead Plaintiff is a member of the Class and does not have interests antagonistic to, or in conflict with, the other members of the Class.

217.    Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff and all members of the Class purchased and/or held shares in any mutual fund in the MFS fund family adversely affected by market timing and/or late trading that was advised by MFS, and have sustained damages arising out of the uniform course of wrongful conduct alleged herein.

218.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged.  Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

VI.    CAUSES OF ACTION

COUNT I

Against Defendants Massachusetts Investor Trust, Massachusetts Investor
Growth Stock Fund, MFS Government Securities Fund, MFS Series Trust I,
MFS Series Trust II, MFS Series Trust IV, MFS Series Trust V, MFS
Series Trust IX, MFS Series Trust X, MFD, Ballen, And Parke
For Violations Of § 11 Of The Securities Act

219.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter, except that, for purposes of this claim, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

220.    This claim is brought pursuant to Section 11 of the Securities Act (15 U.S.C. § 77k) against defendants Massachusetts Investor Trust, Massachusetts Investor Growth Stock Fund, MFS Government Securities Fund, MFS Series Trust I, MFS Series Trust II, MFS Series

Trust IV, MFS Series Trust V, MFS Series Trust IX, MFS Series Trust X, MFD, Ballen, and Parke.

221.   The defendants named in this Court violated Section 11 of the Securities Act in that the registration statements and prospectuses issued for the MFS Funds contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading. The Prospectuses failed to disclose and misrepresented, *inter alia*, the following material and adverse facts:

(a)    that defendants regularly allowed, and had entered into agreements which allowed, certain investors to engage in trades that were disruptive to the efficient management of the MFS Funds and/or increased the MFS Funds' costs and thereby reduced the MFS Funds' actual performance; and

(b)    that, pursuant to these unlawful agreements, defendants benefited financially at the expense of the MFS Fund investors.

222.   The defendants named in this Count issued, caused to be issued, and participated in the issuance of the materially false and misleading written statements and/or omissions of material facts that were contained in the MFS Prospectuses.

223.   The defendants named in this Count, and each of them, had the duty of investigating the information contained in the MFS Prospectuses before the dissemination to MFS Fund shareholders, and failed to satisfy that duty. The defendants named in this Count, and each of them, owed to the MFS Fund shareholders, included Lead Plaintiff and the Class, the duty to ensure that the statements contained in the MFS Prospectuses were true and complete and that there was no omission to state material facts required to be stated in order to make the

statements contained therein not misleading.  By virtue of the misrepresentations and omissions contained in or omitted from the prospectuses, as herein alleged, defendants, and each of them, are liable to Lead Plaintiffs and the Class.

224.    Prior to purchasing and/or reinvesting in MFS Fund shares, Lead Plaintiff and Class members were provided with the appropriate prospectuses, without the knowledge of the untruths and/or omissions contained herein.  Lead Plaintiff and Class members purchased and/or reinvested in the shares of the MFS Funds traceable to the false and misleading prospectuses.

225.    As a direct and proximate result of defendants' misconduct and material misstatements and omissions contained in the prospectuses, Lead Plaintiff and the Class suffered substantial damages.  The true value of the MFS Funds during the Class Period was less than the NAV paid by plaintiffs in the Class due to defendants' violations.

226.    This claim was brought within the applicable statute of limitations.  At the time they purchased and/or reinvested in the MFS Funds shares traceable to the defective prospectuses, Lead Plaintiff and Class members were without knowledge of the facts concerning the false and misleading statements and omissions alleged herein and could not reasonably have possessed such knowledge.

<u>COUNT II</u>

Against Defendants Massachusetts Investor Trust,
Massachusetts Investor Growth Stock Fund, MFS Government Securities
Fund, MFS Series Trust I, MFS Series Trust II, MFS Series Trust IV,
MFS Series Trust V, MFS Series Trust IX, MFS Series Trust X,
<u>And MFD For Violations Of § 12(a)(2) Of The Securities Act</u>

227.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter, except that, for purposes of this claim, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

78

228.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act against defendants Massachusetts Investor Trust, Massachusetts Investor Growth Stock Fund, MFS Government Securities Fund, MFS Series Trust I, MFS Series Trust II, MFS Series Trust IV, MFS Series Trust V, MFS Series Trust IX, MFS Series Trust X, And MFD For Violations Of § 12(A)(2) Of The Securities Act.  Lead Plaintiff does not assert that the defendants named in this Count are liable for fraudulent or intentional conduct.

229.    Each of the defendants named in this Count was a seller of a security, specifically MFS mutual funds sold pursuant to the MFS Prospectuses.

230.    By means of the MFS Prospectuses, the registrant defendants sold the MFS mutual funds to Lead Plaintiff and the members of the Class.  Each of the defendants' named in this Count actions of solicitation consisted primarily of the preparation and dissemination of the MFS Prospectuses.

231.    The MFS mutual funds sold pursuant to the MFS Prospectuses by defendants named in this Count were sold through the use of interstate communication, the use of interstate commerce, and the use of the United States mail.

232.    The MFS mutual funds were sold through the use of the MFS Prospectuses which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading.

233.    The defendants named in this Count cannot prove that they did not know or, in the exercise of reasonable care, could not have known of the untruth or omission described in the preceding paragraphs.

234.    By reason of the conduct alleged herein, each defendant violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of defendants' conduct, Lead Plaintiff and

the other members of the Class suffered substantial damage in connection with the purchase of

MFS mutual funds, and are entitled to rescission.

COUNT III

Against The Sun Life Defendants And
Defendants MFS, Ballen, And Parke
For Violations Of § 15 Of The Securities Act

235.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth

above as though fully set forth hereafter, except that, for purposes of this claim, Lead Plaintiff

expressly excludes and disclaims any allegation that could be construed as alleging fraud or

intentional or reckless misconduct.

236.    This claim is brought pursuant to Section 15 of the Securities Act Against The

Sun Life Defendants and Defendants MFS, Ballen, and Parke as control persons of

Massachusetts Investor Trust, Massachusetts Investor Growth Stock Fund, MFS Government

Securities Fund, MFS Series Trust I, MFS Series Trust II, MFS Series Trust IV, MFS Series

Trust V, MFS Series Trust IX, MFS Series Trust X, and MFD.  It is appropriate to treat these

defendants as a group for pleading purposes and to presume that the false, misleading and

incomplete information conveyed in the Prospectuses, public filings, press releases and other

publications are the collective actions of The Sun Life Defendants and Defendants MFS, Ballen,

and Parke.

237.    The Registrants are each liable under Sections 11 and 12(a)(2) of the Securities

act as set forth herein.

238.    The Sun Life Defendants and Defendants MFS, Ballen, and Parke were "control

persons" of the registrants within the meaning of Section 15 of the Securities Act, by virtue of

their position of operational control and/or authority over such funds.  The Sun Life Defendants

and Defendants MFS, Ballen, and Parke directly and indirectly, had the power and authority, and

80

exercised the same, to cause Massachusetts Investor Trust, Massachusetts Investor Growth Stock Fund, MFS Government Securities Fund, MFS Series Trust I, MFS Series Trust II, MFS Series Trust IV, MFS Series Trust V, MFS Series Trust IX, MFS Series Trust X, and MFD to engage in the wrongful conduct complained of herein.  The Sun Life Defendants and Defendants MFS, Ballen, and Parke issued, caused to be issued, and participated in the issuance of materially false and misleading statements in the Prospectuses.

239.    Pursuant to Section 15 of the Securities Act, by reason of the foregoing, The Sun Life Defendants and Defendants MFS, Ballen, and Parke are liable to plaintiffs to the same extent as are Massachusetts Investor Trust, Massachusetts Investor Growth Stock Fund, MFS Government Securities Fund, MFS Series Trust I, MFS Series Trust II, MFS Series Trust IV, MFS Series Trust V, MFS Series Trust IX, MFS Series Trust X, and MFD for their primary violations of Sections 11 and 12(a)(2) of the Securities Act.

240.    By virtue of the foregoing, Lead Plaintiff and other Class members are entitled to damages against The Sun Life Defendants and Defendants MFS, Ballen, and Parke.

<u>COUNT IV</u>

Against All Defendants
For Violations Of § 10(b) Of The Exchange
<u>Act And Rule 10b-5 Promulgated Thereunder</u>

241.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter, except for Claims brought pursuant to the Securities Act.

242.    This claim is brought pursuant to Section 10(b) of the Exchange Act (15 U.S.C. § 78j) against all defendants on behalf of all persons who purchased shares in any mutual fund in the MFS fund family adversely affected by market timing and/or late trading that was advised by MFS during the period from December 15, 1998 to December 8, 2003.

81

243.    During the Class Period, each of the defendants named herein carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein, and caused Lead Plaintiff and other members of the Class to purchase MFS Funds shares or interests at distorted prices that they would not have paid had they known of the unlawful conduct alleged herein.   In addition, in connection with the unlawful purchases and sales of securities described above, members of the Class suffered damages from, among other things, the dilution of their investment in the MFS mutual funds.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

244.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the MFS Funds' securities, including Lead Plaintiff and other members of the Class, in an effort to enrich themselves through undisclosed manipulative trading tactics by which they wrongfully appropriated MFS Funds' assets and otherwise distorted the pricing of their securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

245.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the MFS Funds' operations, as specified herein.

246.    Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from secretly timed trading and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and members of the Class.

247.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

248.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of MFS Funds securities were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein.  In ignorance of these facts that market prices of the shares were distorted, and relying directly or indirectly on the false and misleading statements made by the MFS defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of materially adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired the shares or interests in the MFS Funds during the Class Period at distorted prices and were damaged thereby.

249.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and other members of the Class and the marketplace known of the truth concerning the MFS Funds' operations, which were not disclosed by defendants, Lead Plaintiff and other

members of the Class would not have purchased or otherwise acquired their shares or, if they had acquired such shares or other interests during the Class Period, they would not have done so at the distorted prices which they paid.

250.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

<u>COUNT V</u>

Against All Defendants For Violations Of § 10(b) Of
<u>The Exchange Act And Rule 10b-5 Promulgated Thereunder</u>

251.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter, except for Claims brought pursuant to the Securities Act.

252.    This claim is brought pursuant to Section 10(b) of the Exchange Act (15 U.S.C. § 78j) against all defendants on behalf of all persons who held shares in any mutual fund in the MFS fund family adversely affected by market timing and/or late trading that was advised by MFS during the period from December 15, 1998 to December 8, 2003.

253.    During the Class Period, each of the defendants named herein carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein, and caused Lead Plaintiff and other members of the Class to hold MFS Funds shares or interests.  In connection with the unlawful purchases and sales of  MFS Funds by the market timers and late traders described above, members of the Class suffered damages from, among other things, the dilution of their investment in the MFS mutual funds.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

254.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the holders of the MFS Funds' securities, including Lead Plaintiff and other members of the Class, in an effort to enrich themselves through undisclosed manipulative trading tactics by which they wrongfully appropriated MFS Funds' assets and otherwise distorted the pricing of their securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

255.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the MFS Funds' operations, as specified herein.

256.    Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from secretly timed trading and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and members of the Class.

257.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

258.    Lead Plaintiff and the other members of the Class were also damaged by virtue of their status as holders of the various mutual funds in the MFS fund family adversely affected by market timing and/or late trading that was advised by the MFS Advisers.  In connection with the unlawful purchases and sales of securities by market timers and late traders, as alleged herein, Lead Plaintiff and the other members of the Class suffered substantial damages, including but not limited to the dilution of the value of their investment stemming from the activity of the market timers and late traders.  But for these unlawful purchases and sales, Lead Plaintiff and the other members of the Class would not have suffered damages from the dilution of their investment alleged herein.

259.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

COUNT VI

Against The Sun Life Defendants and<br>Defendants MFS, Ballen, And Parke<br>For Violations Of § 20(a) Of The Exchange Act

260.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter, except for Claims brought pursuant to the Securities Act.

261.    This claim is brought pursuant to Section 20(a) of the Exchange Act (15 U.S.C. § 78t) against The Sun Life Defendants and Defendants MFS, Ballen, and Parke.

262.    The defendants named herein acted as controlling persons of the MFS Funds within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein.  By virtue of their operational and management control of the MFS Funds' respective businesses and systematic involvement in the fraudulent scheme alleged herein, the defendants named in this Count each had the power to influence and control and did influence and control, directly or

86

indirectly, the decision making and actions of the MFS Funds, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. MFS had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to be corrected.

263.    In particular, each of the defendants names herein had direct and supervisory involvement in the operations of the MFS Funds and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

264.    As set forth above, each of the defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the defendants named in this Count are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with the purchase or holding of MFS Funds during the Class Period.

## VIOLATIONS OF THE INVESTMENT COMPANY ACT OF 1940

### COUNT VII

Against Defendants Massachusetts Investor Trust,
Massachusetts Investor Growth Stock Fund, MFS
Government Securities Fund, MFS Series Trust I, MFS
Series Trust II, MFS Series Trust IV, MFS Series Trust V,
MFS Series Trust IX, MFS Series Trust X, MFS, Ballen, And
Parke For Violations Of § 34(b) Of The Investment Company Act

265.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

266.    This claim is brought pursuant to Sections 34(b) of the ICA (15 U.S.C. § 80a 33(b)) against defendants Massachusetts Investor Trust, Massachusetts Investor Growth Stock

Fund, MFS Government Securities Fund, MFS Series Trust I, MFS Series Trust II, MFS Series Trust IV, MFS Series Trust V, MFS Series Trust IX, MFS Series Trust X, MFS, Ballen, and Parke.

267. Under Section 34(b) of the ICA, it is unlawful for any person to make any untrue statement of a material fact in any registration statement application, report, account, record or other document filed or transmitted pursuant to this title or the keeping of which is required pursuant to section 31(a) of the ICA (15 U.S.C. § 80a 30(a)). It is also unlawful for any person so filing, transmitting, or keeping any such document, to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

268. Defendants made untrue statements of a material fact in its registration statement, application, report, account, record and/or other document filed or transmitted pursuant to this title, or the keeping of which is required pursuant to section 31(a) of the ICA (15 U.S.C. § 80a 30(a)).

269. Lead Plaintiff and other Class members have been injured as a result of defendants' statements, conduct and violations.

COUNT VIII

Against Defendants MFS, MFD, Ballen, And Parke
For Violations Of § 36(a) Of The Investment Company Act

270. Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

271. This claim is brought pursuant to Section 36(a) of the ICA (15 U.S.C. § 80a 35(a)), against defendants MFS, MFD, Ballen, and Parke.

272.    Under Section 36(a), the defendants named in this Count are deemed to owe fiduciary duties to Lead Plaintiff and other Class members and are prohibited from engaging in misconduct with respect to the MFS funds.

273.    The defendants named in this Count devised and participated in a scheme to obtain substantial fees and other income for themselves and their affiliates by allowing others to engage in market timing of MFS mutual funds throughout the Class Period, solely for their own benefit and to the detriment of Lead Plaintiff and the Class, in violation of their fiduciary duties to Lead Plaintiff and other Class members.  Defendants further failed to reveal material facts concerning their conduct, such that Lead Plaintiff and other Class members could have made informed decisions about the true value and performance of MFS mutual funds.

274.    Lead Plaintiff and other Class members have been injured as a result of defendants' statements, conduct, and violations.

## COUNT IX

Against Defendants Massachusetts Investor Trust,
Massachusetts Investor Growth Stock Fund,
MFS Government Securities Fund, MFS Series
Trust I, MFS Series Trust II, MFS Series Trust IV,
MFS Series Trust V, MFS Series Trust IX,
MFS Series Trust X, MFS, MFD, And MFSSC
For Violations Of § 36(b) Of The Investment Company Act

275.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

276.    This claim is brought pursuant to Section 36(b) of the ICA (15 U.S.C. § 80a 35(b)) against defendants Massachusetts Investor Trust, Massachusetts Investor Growth Stock Fund, MFS Government Securities Fund, MFS Series Trust I, MFS Series Trust II, MFS Series Trust IV, MFS Series Trust V, MFS Series Trust IX, MFS Series Trust X, MFS, MFD, AND MFSC.

277.    Under Section 36(b) of the ICA, the defendants named in this Count are deemed to owe a fiduciary duty to Lead Plaintiff and other Class members with respect to the receipt of fees and compensation that defendants received for services of a material nature.

278.    Defendants devised and implemented a scheme to obtain substantial and improper fees and other income for themselves and their affiliates by allowing others to engage in timing and/or late trading of MFS Funds throughout the Class Period and in violation of their fiduciary duties to Lead Plaintiff and other Class members.  The defendants named in this Count failed to reveal material facts concerning their conduct, such that Lead Plaintiff and other Class members could have made informed decisions about the true value and performance of the MFS Funds. Moreover, the investment advisory contract between MFS and the MFS Funds was not the product of arm's-length bargaining and the fees charged under the contract did not bear a reasonable relationship to the services rendered under it, especially with respect to MFS's participation in market timing and late trading activities.

279.    Lead Plaintiff and other Class members have been injured as a result of defendants' statements, conduct, and improper fees.

### COUNT X

Against The Sun Life Defendants And
Defendants MFS, Ballen, And Parke For
Violations Of § 48(a) Of The Investment Company Act

280.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

281.    This claim is brought pursuant to Section 48(a) of the ICA (15 U.S.C. § 80a 47) against The Sun Life Defendants and Defendants MFS, Ballen, and Parke.

282.    Under Section 48(a) of the ICA, it is unlawful for any defendant to do indirectly that which, under the Act, it could not do directly.

90

283.    Defendants devised and implemented a scheme to obtain substantial fees and other income for themselves and their affiliates by allowing others to engage in market timing and/or late trading of MFS Funds throughout the Class Period and in violation of their fiduciary duties to Lead Plaintiff and other Class members.  Defendants failed to reveal material facts concerning their conduct, such that Lead Plaintiff and other Class members could have made informed decisions about the true value and performance of the MFS Funds.

284.    Lead Plaintiff and other Class members have been injured as a result of defendants' statements, conduct and improper fees.

## VIOLATIONS OF STATE AND COMMON LAW

### COUNT XI

Against Defendants The Sun Life Defendants And
Defendants Massachusetts Investor Trust, Massachusetts
Investor Growth Stock Fund, MFS Government Securities
Fund, MFS Series Trust I, MFS Series Trust II, MFS Series
Trust IV, MFS Series Trust V, MFS Series Trust IX, MFS
Series Trust X, MFS, MFD, And MFSSC, Ballen, And Parke
For Breach Of Fiduciary Duty/Constructive Fraud

285.    Lead Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

286.    Defendants named in this count owed fiduciary duties to Lead Plaintiff and the Class to use reasonable care and skill in operating, administering, issuing, underwriting, distributing and managing the MFS family of funds.  As a part of their fiduciary duties to Lead Plaintiff and the Class, defendants named in this count also owed a duty to make a full and truthful disclosure of all material facts, to ensure that their representations regarding market timing and late trading were complete and accurate, and to ensure that actions were taken to protect long-term holders of mutual fund shares in the MFS family of funds from damage caused to their investments from market timing and late trading.

91

287.     Defendants named in this count intentionally or recklessly breached their fiduciary duties by allowing favored investors to conduct timed and/or late trading in the MFS family of funds, by misrepresenting and concealing the existence of such market timing and late trading, and by placing their own financial interests above those of Lead Plaintiff and members of the Class.

288.     Defendants named in this count breached their fiduciary duties to Lead Plaintiff and the Class, tended to deceive, violated public and private confidence and injured public interests.

289.     Lead Plaintiff and members of the Class suffered injury as a result of defendants conduct in the form of following, *inter alia*: increased transaction costs and expenses; reduced investment performance; and, Lead Plaintiff and members of the Class paid a higher price for MFS mutual fund shares than they would have paid had the mutual funds been priced accurately to reflect the dilution of profits and increased costs and expenses that were caused by the breaches of duty by defendants alleged herein.

290.     Defendants' breaches of their fiduciary duties proximately caused the damages suffered by Lead Plaintiff and the Class.

<u>COUNT XII</u>

Against All Defendants For Aiding And
<u>Abetting Breach Of Fiduciary Duty</u>

291.     Lead Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

292.     As alleged above, the defendants named in Count XI owed a fiduciary duty to Lead Plaintiff and members of the Class.   That duty was breached when those defendants permitted favored investors to late trade and/or market time in the MFS family of funds.

293.    Defendants named in this count knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted the defendants named in Count XI above in the breach of their fiduciary duties.

294.    As a result of Defendants' aiding and abetting of the breaches of fiduciary duty, Lead Plaintiff and members of the Class suffered damages.

<u>COUNT XIII</u>

<u>Against All Defendants For Unjust Enrichment</u>

295.    Lead Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

296.    Lead Plaintiff and members of the Class conferred a benefit on the defendants named in this Count.    Defendants derived management fees and other benefits and were otherwise unjustly enriched from transactions connected with the MFS family of funds, to the detriment of Lead Plaintiff and members of the Class.

297.    Defendants' enrichment is directly and causally related to the detriment of Lead Plaintiff and members of the Class.

298.    The benefit was accepted by Defendants under such circumstances that it would be inequitable for it to be retained without payment.    As alleged above, defendants named in this Count , *inter alia*, breached their fiduciary duties to Lead Plaintiff and members of the Class and therefore defendants named in this Count are not justified to retain the benefits conferred upon them.

299.    As a result of all of the defendants' conduct, Lead Plaintiff and members of the Class suffered damages.

300.    There is no adequate remedy at law to compensate for the injuries of Lead Plaintiff and members of the Class.

VII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Lead Plaintiff, on behalf of itself and the members of the Class, prays for judgment as follows:

1.    Declaring this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure and declaring Lead Plaintiff to be a proper Class Representative;

2.    Awarding Lead Plaintiff and the other members of the Class compensatory damages as a result of the wrongs alleged herein, including interest thereon;

3.    Awarding Lead Plaintiff and the other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

4.    Granting Lead Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

VIII.  <u>JURY TRIAL DEMANDED</u>

Lead Plaintiff demands a trial by jury of all issues so triable.

Dated:  September 29, 2004

BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP


_____/s/_____
ALAN SCHULMAN
ROBERT S. GANS
TIMOTHY A. DeLANGE
JERALD D. BIEN-WILLNER
12544 High Bluff Drive, Suite 150
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323
    -and-
J. ERIK SANDSTEDT
JOSEPH A. FONTI
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
*Lead Counsel*


Dated:  September 29, 2004

TYDINGS & ROSENBERG LLP


_____/s/_____
WILLIAM C. SAMMONS, Fed Bar No. 02366
JOHN B. ISBISTER, Fed Bar No. 00639
100 East Pratt Street, 26th Floor
Baltimore, MD 21202
Tel:    (410) 752-9700
Fax:    (410) 727-5460
*Liaison Counsel*

CERTIFICATE OF SERVICE

I, Alan Schulman, do hereby certify that on this 30th day of September 2004, a true and correct copy of ***CONSOLIDATED AMENDED CLASS ACTION COMPLAINT*** was electronically filed in this case on September 30, 2004, and was served on counsel of record via electronic mail in Portable Document File ("PDF") in accordance with Fed. R. Civ. P. 5(b).

_____/s/_____
ALAN SCHULMAN

::ODMA\PCDOCS\BLBGCA\15749;2

1

# APPENDIX A

APPENDIX A

<u>New Defendants</u>

Banc of America Securities LLC
Bank of America Corporation
Bear Stearns & Co., Inc.
Bear Stearns Securities Corp.
Canadian Imperial Bank of Commerce
Canadian Imperial Holdings, Inc.
Canary Capital Partners, LLC
Canary Capital Partners, Ltd.
Canary Investment Management, LLC
Charles Schwab & Co.
Citigroup Global Markets Holdings Inc.
Citigroup, Inc.
Credit Suisse First Boston (USA) Inc.
Daniel G. Calugar
Edward J. Stern
Grant Seeger
James G. Lewis
James Y. Lin
JB Oxford Holdings, Inc.
John Peffer
John W. Ballen
JP Morgan Chase and Co.
Justin Ficken
Kevin R. Parke
Kraig L. Kibble
Marc C. Bilotti
Martin Druffner
Massachusetts Investors Growth Stock Fund
MFS Fund Distributors
MFS Series Trust
MFS Service Center, Inc.
Michael Grady
Michael Vanin
Morgan Stanley Dean Witter
National Clearing Corporation
Paul A. Flynn
Prudential Financial, Inc.
Prudential Securities, Inc.
Robert Shannon
Ryan Goldberg
Salomon Smith Barney, Inc.
Security Brokerage, Inc.

Security Trust Company, N.A.
Skifter Ajro
Sun Life Assurance Company of Canada
Sun Life Financial (U.S.) Investments LLC
Sun Life of Canada (U.S.) Financial Services Holdings, Inc.
Theodore C. Sihpol, III
Trout Trading Management Co.
Wachovia Corporation
Wachovia Securities, LLC
Wilshire Associates Incorporated

Previously Named Defendants Not Named Herein

MFS Series Trust III
MFS Series Trust VI
MFS Series Trust VII
MFS Series Trust VIII
MFS Series Trust X
MFS Series XI
MFS Capital Opportunities Fund
MFS Core Growth Fund
MFS Emerging Growth Fund
MFS Large Cap Growth Fund
MFS Managed Sectors Fund
MFS Mid Cap Growth Fund
MFS New Discovery Fund
MFS New Endeavor Fund
MFS Research Fund
MFS Strategic Growth Fund
MFS Technology Fund
MFS Mid Cap Value Fund
MFS Research Growth And Income Fund
MFS Total Return Fund
MFS Union Standard Equity Fund
MFS Utilities Fund
MFS Value Fund
MFS Aggressive Growth Allocation Fund
MFS Conservative Allocation Fund
MFS Moderate Allocation Fund
MFS Bond Fund
MFS Emerging Markets Debt Fund
MFS Government Limited Maturity Fund
MFS Government Mortgage Fund
MFS High Income Fund
MFS High Yield Opportunities Fund
MFS Intermediate Investment Grade Bond Fund

Massachusetts Investors Growth Stock
MFS Limited Maturity Fund
MFS Research Bond Fund
MFS Strategic Income Fund
MFS Alabama Municipal Bond Fund
MFS Arkansas Municipal Bond Fund
MFS California Municipal Bond Fund
MFS Florida Municipal Bond Fund
MFS Georgia Municipal Bond Fund
MFS Maryland Municipal Bond Fund
MFS Massachusetts Municipal Bond Fund
MFS Municipal Bond Fund
MFS Municipal Limited Maturity Fund
MFS New York Municipal Bond Fund
MFS North Carolina Municipal Bond Fund
MFS Pennsylvania Municipal Bond Fund
MFS South Carolina Municipal Bond Fund
MFS Tennessee Municipal Bond Fund
MFS Virginia Municipal Bond Fund
MFS West Virginia Municipal Bond Fund
MFS Emerging Markets Equity Fund
MFS Global Equity Fund
MFS Global Growth Fund
MFS Global Total Return Fund
MFS International Growth Fund
MFS International New Discovery Fund
MFS International Value Fund
MFS Research International Fund

# APPENDIX B

APPENDIX B

## MFS FUNDS SEC FILINGS

### MASSACHUSETTS INVESTORS TRUST

| DOCUMENT | FILING DATE |
|---|---|
| Registration Statement, Post Effective Amendment No. 75 (including all other filings incorporated therein by reference) | April 30, 1998, effective on April 30, 1998 |
| Registration Statement, Post Effective Amendment No. 76 (including all other filings incorporated therein by reference) | February 26, 1999, effective on April, 30,1999 |
| Registration Statement, Post Effective Amendment No. 77 (including all other filings incorporated therein by reference) | October 29, 1999, effective 60 days after filing |
| Registration Statement, Post Effective Amendment No. 78 (including all other filings incorporated therein by reference) | April 28, 2000, effective on April 29, 2000 |
| Registration Statement, Post Effective Amendment No. 79 (including all other filings incorporated therein by reference) | March 1, 2001, effective April 30, 2001 |
| Registration Statement, Post Effective Amendment No. 80 (including all other filings incorporated therein by reference) | April 30, 2002, effective on April 30, 2002 |
| Registration Statement, Post Effective Amendment No. 81 (including all other filings incorporated therein by reference) | July 30, 2002, effective immediately upon filing |
| Registration Statement, Post Effective Amendment No. 82 (including all other filings incorporated therein by reference) | December 23, 2002, effective on December 24, 2002 |
| Registration Statement, Post Effective Amendment No. 83 (including all other filings incorporated therein by reference) | April 30, 2003, effective on April 30, 2003 |

APPENDIX B

## MFS FUNDS SEC FILINGS

| | |
|---|---|
| Registration Statement, Post Effective Amendment No. 84 (including all other filings incorporated therein by reference) | October 30, 2003, effective on October 31, 2003 |
| Registration Statement, Post Effective Amendment No. 75 (including all other filings incorporated therein by reference) | March 28, 2003, effective on March 30, 2003 |

## <u>MASSACHUSETTS INVESTORS GROWTH STOCK FUND</u>

| DOCUMENT | FILING DATE |
|---|---|
| Registration Statement, Post Effective Amendment No. 65 (including all other filings incorporated therein by reference) | March 30, 1998, effective immediately upon filing |
| Registration Statement, Post Effective Amendment No. 66 (including all other filings incorporated therein by reference) | January 28, 1999, effective on March, 30,1999 |
| Registration Statement, Post Effective Amendment No. 67 (including all other filings incorporated therein by reference) | March 29, 2000, effective immediately upon filing |
| Registration Statement, Post Effective Amendment No. 68 (including all other filings incorporated therein by reference) | September 21, 2000, effective 60 days after filing |
| Registration Statement, Post Effective Amendment No. 69 (including all other filings incorporated therein by reference) | March 30, 2001, effective immediately upon filing |
| Registration Statement, Post Effective Amendment No. 70 (including all other filings incorporated therein by reference) | March 26, 2002, effective on March 30, 2002 |
| Registration Statement, Post Effective Amendment No. 71 (including all other filings incorporated therein by reference) | April 05, 2002, effective 60 days after filing |

APPENDIX B

## MFS FUNDS SEC FILINGS

| | |
|---|---|
| Registration Statement, Post Effective Amendment No. 72 (including all other filings incorporated therein by reference) | June 04, 2002, effective on July 05, 2002 |
| Registration Statement, Post Effective Amendment No. 73 (including all other filings incorporated therein by reference) | June 11, 2002, effective 60 days after filing |
| Registration Statement, Post Effective Amendment No. 74 (including all other filings incorporated therein by reference) | December 23, 2002, effective on December 24, 2002 |
| Registration Statement, Post Effective Amendment No. 75 (including all other filings incorporated therein by reference) | March 28, 2003, effective on March 30, 2003 |
| Registration Statement, Post Effective Amendment No. 76 (including all other filings incorporated therein by reference) | October 30, 2003, effective on October 31, 2003 |

## MFS GOVERNMENT SECURITIES FUND

| DOCUMENT | FILING DATE |
|---|---|
| Registration Statement, Post-Effective Amendment No. 22 (including all other filings incorporated therein by reference) | June 25, 1998 effective on June 28, 1998 |
| Registration Statement, Post-Effective Amendment No. 23 (including all other filings incorporated therein by reference) | April 29, 1999 effective on June 28, 1999 |
| Registration Statement, Post-Effective Amendment No. 24 (including all other filings incorporated therein by reference) | June 28, 2000, effective on June 28, 2000 |
| Registration Statement, Post Effective Amendment No. 25 (including all other filings incorporated therein by reference) | June 28, 2001, effective on June 28, 2001 |

APPENDIX B

**MFS FUNDS SEC FILINGS**

| | |
|---|---|
| Registration Statement, Post Effective Amendment No. 26 (including all other filings incorporated therein by reference) | June 25, 2002, effective on June 28, 2002 |
| Registration Statement, Post Effective Amendment No. 27 (including all other filings incorporated therein by reference) | July 30, 2002, effective immediately upon filing |
| Registration Statement, Post Effective Amendment No. 28 (including all other filings incorporated therein by reference) | December 23, 2002, effective on December 24, 2002 |
| Registration Statement, Post Effective Amendment No. 29 (including all other filings incorporated therein by reference) | June 27, 2003, effective on June 27, 2003 |
| Registration Statement, Post Effective Amendment No. 30 (including all other filings incorporated therein by reference) | August 1, 2003, effective on September 30, 2003 |

**MFS SERIES TRUST I**

**MFS Value Fund**

| DOCUMENT | FILING DATE |
|---|---|
| Registration Statement, Post-Effective Amendment No. 33 (including all other filings incorporated therein by reference) | November 30, 1998, effective on December 29, 1998 |
| Registration Statement, Post-Effective Amendment No. 37 (including all other filings incorporated therein by reference) | October 30, 2000, effective on December 29, 2000 |
| Registration Statement, Post-Effective Amendment No. 40 (including all other filings incorporated therein by reference) | July 30, 2002, effective immediately upon filing |
| Registration Statement, Post-Effective Amendment No. 42 (including all other filings incorporated therein by reference) | October 30, 2003, effective on October 31, 2003 |

4

APPENDIX B

## MFS FUNDS SEC FILINGS

### MFS SERIES TRUST I

**Cash Reserve Fund**

| DOCUMENT | FILING DATE |
|---|---|
| Registration Statement, Post-Effective Amendment No. 33 (including all other filings incorporated therein by reference) | November 30, 1998, effective on December 29, 1998 |
| Registration Statement, Post-Effective Amendment No. 40 (including all other filings incorporated therein by reference) | July 30, 2002, effective immediately upon filing |
| Registration Statement, Post-Effective Amendment No. 41 (including all other filings incorporated therein by reference) | December 27, 2002, effective on December 29, 2002 |
| Registration Statement, Post-Effective Amendment No. 43 (including all other filings incorporated therein by reference) | December 29, 2003, effective immediately upon filing |

### MFS SERIES TRUST II

**MFS Emerging Growth Fund**

| DOCUMENT | FILING DATE |
|---|---|
| Registration Statement, Post Effective Amendment No. 25 (including all other filings incorporated therein by reference) | March 27, 1998, effective on March, 30,1998 |
| Registration Statement, Post Effective Amendment No. 27 (including all other filings incorporated therein by reference) | May 29, 1998, effective 60 days after filing |
| Registration Statement, Post Effective Amendment No. 28 (including all other filings incorporated therein by reference) | January 29, 1999, effective 60 days after filing |
| Registration Statement, Post Effective Amendment No. 29 (including all other filings incorporated therein by reference) | March 29, 2000, effective immediately upon filing |

APPENDIX B

## MFS FUNDS SEC FILINGS

### MFS SERIES TRUST II

**MFS Emerging Growth Fund**

| DOCUMENT | FILING DATE |
|---|---|
| Registration Statement, Post Effective Amendment No. 30 (including all other filings incorporated therein by reference) | March 30, 2001, effective immediately upon filing |
| Registration Statement, Post Effective Amendment No. 31 (including all other filings incorporated therein by reference) | March 28, 2002, effective on March 30, 2002 |
| Registration Statement, Post Effective Amendment No. 32 (including all other filings incorporated therein by reference) | July 30, 2002, effective immediately upon filing |
| Registration Statement, Post Effective Amendment No. 33 (including all other filings incorporated therein by reference) | December 23, 2002, effective on December 24, 2002 |
| Registration Statement, Post Effective Amendment No. 34 | March 28, 2003, effective on March 30, 2003 |
| Registration Statement, Post Effective Amendment No. 35 (including all other filings incorporated therein by reference) | October 3, 2003, effective on October 31, 2003 |

### MFS SERIES TRUST IV

| DOCUMENT | FILING DATE |
|---|---|
| Registration Statement, Post Effective Amendment No. 33 (including all other filings incorporated therein by reference) | November 30, 1998, effective on December 29, 1998 |
| Registration Statement, Post Effective Amendment No. 34 (including all other filings incorporated therein by reference) | October 29, 1999, effective on December, 29, 1999 |

6

APPENDIX B

## MFS FUNDS SEC FILINGS

| | |
|---|---|
| Registration Statement, Post Effective Amendment No. 35 (including all other filings incorporated therein by reference) | December 29, 2000, effective immediately upon filing |
| Registration Statement, Post Effective Amendment No. 36 (including all other filings incorporated therein by reference) | December 28, 2001, effective on December 29, 2001 |
| Registration Statement, Post Effective Amendment No. 38 (including all other filings incorporated therein by reference) | December 20, 2002, effective on December 29, 2002 |
| Registration Statement, Post Effective Amendment No. 40 (including all other filings incorporated therein by reference) | December 29, 2003, effective on December 29, 2003 |

## MFS SERIES TRUST V

### MFS Research Fund

| DOCUMENT | FILING DATE |
|---|---|
| Registration Statement, Post Effective Amendment No. 47 (including all other filings incorporated therein by reference) | November 25, 1998, effective on January 28, 1999 |
| Registration Statement, Post Effective Amendment No. 45 (including all other filings incorporated therein by reference) | January 27, 1998, effective on January 28, 1998 |
| Registration Statement, Post Effective Amendment No. 55 (including all other filings incorporated therein by reference) | October 30, 2003, effective October 31, 2003 |

APPENDIX B

## MFS FUNDS SEC FILINGS

### MFS SERIES TRUST V

#### MFS Total Return Fund

| DOCUMENT | FILING DATE |
|---|---|
| Registration Statement, Post Effective Amendment No. 45 (including all other filings incorporated therein by reference) | January 27, 1998, effective on January 28, 1998 |
| Registration Statement, Post Effective Amendment No. 47 (including all other filings incorporated therein by reference) | November 25, 1998, effective on January, 28,1999 |
| Registration Statement, Post Effective Amendment No. 48 (including all other filings incorporated therein by reference) | November 29, 1999, effective on January, 28, 2000 |
| Registration Statement, Post Effective Amendment No. 49 (including all other filings incorporated therein by reference) | January 26, 2001, effective immediately upon filing |
| Registration Statement, Post Effective Amendment No. 50 (including all other filings incorporated therein by reference) | November 29, 2001, effective on January 28, 2002 |
| Registration Statement, Post Effective Amendment No. 51 (including all other filings incorporated therein by reference) | January 28, 2002, effective immediately upon filing |
| Registration Statement, Post Effective Amendment No. 52 (including all other filings incorporated therein by reference) | July 30, 2002, effective immediately upon filing |
| Registration Statement, Post Effective Amendment No. 53 (including all other filings incorporated therein by reference) | December 23, 2002, effective on December 24, 2002 |
| Registration Statement, Post Effective Amendment No. 54 (including all other filings incorporated therein by reference) | January 28, 2003, effective immediately upon filing |

APPENDIX B

**MFS FUNDS SEC FILINGS**

| | |
|---|---|
| Registration Statement, Post Effective Amendment No. 55 (including all other filings incorporated therein by reference) | October 30, 2003, effective October 31, 2003 |

**MFS SERIES  TRUST IX**

| DOCUMENT | FILING DATE |
|---|---|
| Registration Statement, Post Effective Amendment No. 35 (including all other filings incorporated therein by reference) | August 27, 1998, effective on August 28, 1998 |
| Registration Statement, Post Effective Amendment No. 38 (including all other filings incorporated therein by reference) | June 29, 1999, effective 60 days after filing |
| Registration Statement, Post Effective Amendment No. 40 (including all other filings incorporated therein by reference) | August, 28 2000, effective upon filing |
| Registration Statement, Post Effective Amendment No. 42 (including all other filings incorporated therein by reference) | August 28, 2001, effective upon filing |
| Registration Statement, Post Effective Amendment No. 43 (including all other filings incorporated therein by reference) | July 30, 2002, effective upon filing |
| Registration Statement, Post Effective Amendment No. 45 (including all other filings incorporated therein by reference) | August 28, 02, effective on August 28, 2002 |
| Registration Statement, Post Effective Amendment No. 46 (including all other filings incorporated therein by reference) | October 16, 2002, effective on December 15, 2002 |
| Registration Statement, Post Effective Amendment No. 47 (including all other filings incorporated therein by reference) | December 23, 2002, effective on December 24, 2002 |

APPENDIX B

## MFS FUNDS SEC FILINGS

| | |
|---|---|
| Registration Statement, Post Effective Amendment No. 49 (including all other filings incorporated therein by reference) | August 28, 2003, effective upon filing |
| Registration Statement, Post Effective Amendment No. 50 (including all other filings incorporated therein by reference) | October 30, 2003, effective on October 31, 2003 |

## MFS SERIES TRUST X

| DOCUMENT | FILING DATE |
|---|---|
| Registration Statement, Post Effective Amendment No. 24(including all other filings incorporated therein by reference) | November 25, 1998, effective on November 28, 1998 |
| Registration Statement, Post Effective Amendment No. 27 (including all other filings incorporated therein by reference) | September 29, 1999, effective 60 days after filing |
| Registration Statement, Post Effective Amendment No. 32 (including all other filings incorporated therein by reference) | November 28, 2000, effective on immediately upon filing |
| Registration Statement, Post Effective Amendment No. 37 (including all other filings incorporated therein by reference) | November 28, 2001, effective on November 28, 2001 |